IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 13, 2020 Session

## CAITLYN METZ v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 41200189          William R. Goodman, III, Judge**

_____

### No. M2019-00883-CCA-R3-PC

_____

A jury convicted Caitlyn Metz, Petitioner, of first-degree felony murder, aggravated child abuse, and aggravated child neglect in the death of her twenty-three-month-old son, the victim, and the trial court sentenced her to an effective life sentence. Petitioner filed a post-conviction petition, asserting ineffective assistance of counsel, a *Brady* violation, and improper prosecutorial argument, and the post-conviction court denied the petition. On appeal, Petitioner contends that she was denied the effective assistance of counsel due to trial counsel's failure to pursue a motion for severance from Joshua Starner, Co-Defendant, and other pretrial motions; failure to investigate Co-Defendant's military records and Petitioner's mental health; failure to present witnesses; and cumulative error. Following a thorough review, we conclude that Petitioner was denied the effective assistance of counsel. We reverse the judgment of the post-conviction court, vacate and set aside the judgments of conviction, and remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and TIMOTHY L. EASTER, JJ., joined.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Caitlyn Metz.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural History

The victim in this case was Petitioner's twenty-three-month-old son. Co-Defendant was indicted for aggravated child abuse; first degree felony murder committed during the perpetration of child abuse; and aggravated rape of a child, in connection with the victim's February 7, 2009 death. Almost three years later, Petitioner was also indicted for the same charges. On direct appeal, this court summarized the facts of the case as follows:

### A. Pretrial Motions

On February 22, 2012, [Petitioner] filed a motion to sever her case from [Co-Defendant]'s case positing that "she d[id] not want any 'spill over.'" At a hearing on the motion to sever, [Petitioner]'s counsel informed the trial court that he had filed a motion to sever the cases at [Petitioner]'s insistence. He said that he did not know if he had a colorable argument and would not know until he was made aware of [Co-Defendant]'s defense. He said that [Petitioner] had asked him to inform the trial court that she believed that she and [Co-Defendant] had inconsistent defenses. He said that [Petitioner] believed that [Co-Defendant] intended to contend that the victim died of natural causes while [Petitioner] intended to contend that [Co-Defendant] killed the victim and that she did not know anything about the killing. The trial court stated that it could not rule on the severance motion without hearing evidence and declined to rule on the motion. It further noted that different defenses would not necessarily warrant a severance. Counsel for [Petitioner] did not pursue this motion further.

The morning of trial, [Petitioner]'s counsel orally raised a *Bruton* issue. The State informed the trial court that both Defendants had given statements and that it intended to introduce them. [Petitioner]'s counsel asked the trial court to redact a portion of [Co-Defendant]'s statement where he said "so did she" in response to questioning about whether he spanked the victim. [Petitioner]'s counsel also took issue with a portion of [Co-Defendant]'s statement wherein he said that [Petitioner] had penetrated the victim's anus on a prior occasion to treat the victim's constipation. The trial court granted [Petitioner]'s motion to redact [Co-Defendant]'s statement.

**B. Trial**

At [Petitioner and Co-Defendant's] trial on these charges, . . . Jeffrey Scott Bates, an emergency medical responder with the Montgomery County Emergency Medical Services, testified that he responded to a call that the victim was not breathing on February 7, 2009. Mr. Bates testified that, when he arrived, [Petitioner] was holding the victim who was draped in a blanket and [Co-Defendant] was "crying and dropping to his knees."

Mr. Bates said that he looked under the blanket to find the victim naked. He escorted the victim and [Petitioner] to the ambulance, took the victim, and placed the victim on the cot in the back of the ambulance. Mr. Bates testified that the child was "almost completely listless" but was making some breathing effort. The breathing effort was "fish breathing or agonal respirations," which he explained as when a child opened its mouth like it was trying to breathe every several seconds and then stopped. Mr. Bates said he could not get any response from the victim.

Mr. Bates said that one of the victim's pupils was completely dilated and the other pupil was sluggish. Mr. Bates intubated the victim and transported him to the hospital. On the way to the hospital, while intubated, the victim began to move in response to painful stimuli such as pinching his toe. Mr. Bates said that the response was "decerebrate posturing," generally meaning that the victim had suffered a deep brain injury.

During cross-examination, Mr. Bates testified that his report of the event stated that [Petitioner] stated that she had just arrived home to find the victim face down on his bed and stable. The report also indicated that, when Mr. Bates arrived, [Co-Defendant] was on his knees, crying, asking Mr. Bates to "save" the victim.

Patrick Seay, an officer with the Clarksville Police Department, testified that he responded to the 911 call in this case. He arrived at approximately the same time as the ambulance and fire department. Officer Seay said that, when he arrived, he saw [Co-Defendant] wearing a pair of [a]rmy fatigue style pants and not wearing a shirt or shoes. He said that [Petitioner] was located near the apartment, which was down a sidewalk from where [Co-Defendant] was located. Officer Seay could see that [Petitioner] was carrying something in her arms, but emergency responders went to her right away and took the child.

Officer Seay said that, as this was an ambulance call, he spoke with [Co-Defendant] only to ascertain what had happened. The officer said that it took a long time for [Co-Defendant] to stop crying as he was "very upset." Eventually, [Co-Defendant] told him that [Petitioner] had gone to the commissary to shop and that he was there at the apartment alone with the victim. He was bathing the victim and left the bathroom briefly. [Co-Defendant] said the victim was playing and splashing in the tub, and he only left the room for a minute or so to get some clothing and a towel for the child. [Co-Defendant] said that, when he came back into the bathroom, the victim was lifting his head out of the water and coughing and spitting up water.

Officer Seay testified that [Co-Defendant] said that the victim seemed "okay" when [Co-Defendant] removed him from the tub. [Co-Defendant] said that he dried the victim off, dressed him, and laid him in his crib. [Co-Defendant] said that he stayed in the victim's room for twenty to twenty-five minutes. When the victim seemed to be doing okay, he left the child and went and took a shower. [Co-Defendant] said that, after he got out of the shower and came back in, the victim appeared to be sleeping peacefully, so he decided to lie down in his own bed and take a nap. He awoke when [Petitioner] screamed that the victim was not breathing, which was when he called 911. Officer Seay said that [Co-Defendant] did not indicate that the victim had suffered any additional injuries.

Mark Crump, a store director with the Fort Campbell Commissary, identified a receipt from the commissary dated February 7, 2009, at 12:05 p.m. The receipt, entered into evidence, confirmed this date and time and showed purchases totaling $132.26.

. . . .

Randle Likes, a staff physician at Gateway Medical Center emergency department, testified that he treated the victim on February 7, 2009. He recalled that the victim was in "severe distress" when the victim arrived at the emergency room. By the time that Dr. Likes treated the victim, the victim had been intubated with a breathing tube because emergency room personnel believed the victim was going to have difficulty protecting the airway secondary to the other injuries he had received. Dr. Likes said that he attempted to work on the child as quickly as possible so that he could transfer the child to Vanderbilt where better trauma capabilities were available.

Dr. Likes recalled that the victim was not conscious. He said that the victim suffered injuries to his head, his buttocks, and his genitalia. He specifically had "a lot" of swelling, bruising, and marks in his anal region. Dr. Likes testified that he spoke with [Petitioner], who told him that the victim's bottom was red before she left for the store but that, when she returned, she found him in severe distress.

During cross-examination by [Co-Defendant]'s attorney, Dr. Likes testified [that Petitioner] made a point to tell him that she had been gone before discovering the victim in distress.

Brandi Batson, a nurse at Gateway Medical Center at the time of this incident, testified that she was present when the victim was brought to the emergency room. She said that [Petitioner] was approximately fifteen feet away from the victim while the victim was lying in the hospital bed. Ms. Batson said that she asked [Petitioner] where all the marks on the victim had come from, and [Petitioner] "[s]hrugged her shoulders and looked away."

Melanie Suiter Menear, also a nurse at Gateway Medical Center at the time of this incident, recalled that she performed a sexual assault kit on [Co-Defendant] to gather evidence. She said that she noted that [Co-Defendant] had recently showered and shaved his pubic hair, which limited her ability to gather evidence. Ms. Menear said that, when she first encountered [Co-Defendant], she found his conversation with her "very inappropriate seeming for the position that [they] were in at th[at] time." She said that his demeanor was different than any other male suspect that she had ever interacted with. During cross-examination by [Co-Defendant]'s counsel, Ms. Menear agreed that she did not know when [Co-Defendant] shaved or whether that was something that he customarily did.

Gregory Plennons, a pediatric physician with Vanderbilt University Medical Center, testified that he was assigned to the victim's case as part of a care team that rotated calls when a child was admitted with an injury that was suspicious as "nonaccidential." Dr. Plennons recognized photographs of the victim and said that he spoke with [Petitioner], inquiring about various injuries on the victim's body. Dr. Plennons asked [Petitioner] about the victim's eye injury, and [Petitioner] told him that four or five days before being hospitalized the victim had been "mudding" in a Jeep with [Co-Defendant]. She said that the victim had been in the front seat

with his [step]father and had fallen out of the car and hit his head on the edge of a door.

When Dr. Plennons asked [Petitioner] about the bruises to the victim's bottom, which were reflected in a photograph, [Petitioner] did not provide an explanation. She did tell the doctor that she and [Co-Defendant] did "spank the boy when he's bad." She said that she thought that the victim "bruised a little bit more than the average two-year-old" and that she mentioned this to a doctor in Oregon.

During cross-examination by [Co-Defendant]'s counsel, Dr. Plennons testified that he did not recall whether [Petitioner] said that she was also present when the victim was injured during the "mudding" incident. Dr. Plennons confirmed that [Petitioner] had told him that she spanked the victim.

Thomas Abramo, a pediatric emergency medicine doctor who was employed at Vanderbilt Children's Medical Center at the time of this incident, testified that he was the Division Director of the pediatric emergency department when the victim was admitted to the hospital. Dr. Abramo testified that, when the victim was transferred to Vanderbilt on February 7, 2009, he was "very sick." He said that the victim was intubated, his vital signs were very critical, and that his symptoms indicated he had significant brain swelling and signs that his brain was causing significant cardiovascular compromise. The victim had obvious bruises and bleeding.

Dr. Abramo testified that he did a full evaluation of the victim's body. He opined that the victim suffered both physical and sexual abuse. He noted that there were injuries to the victim's anal area, penis, and genitalia. He considered the trauma to the genitalia area to be "significant."

During cross-examination by [Co-Defendant]'s counsel, Dr. Abramo testified that his notes indicated that there also appeared to be old bruising marks on the victim. These marks appeared to be more than a day old. Dr. Abramo noted that children suffering brain trauma often presented differently. Some deteriorated immediately and others did not deteriorate for a longer period of time.

Curtis Wushensky, a radiologist at Vanderbilt Medical Center who specialized in the brain and the spine, testified that he read the scan taken of

the victim. He said that the victim's brain was "completely swollen" and that there was a lack of separation between the crooks of the gray and white matter. He also observed some blood along the surface of the brain in the subdural space. Dr. Wushensky said that it was impossible to tell how long it had been since the initial trauma, but he estimated that it took six to eight hours for the injury to manifest.

Dr. Wushensky explained that, while the skull of a small child could slightly expand, the skull is very "nonexpansible." He explained that when a brain is injured and starts to swell it has no place to go, so the pressure in the brain will increase. Eventually, if the brain continues to swell, it will be forced through the neck, similar to a tube of toothpaste. Also, the pressure can increase to a point where a person's heart cannot force blood into the brain, and the brain will be starved of blood.

During cross-examination by [Petitioner]'s counsel, Dr. Wushensky said that most of the studies of this type of trauma had been conducted on adults and not children. Dr. Wushensky agreed that he could not say with a medical degree of certainty how long it took for the victim's brain to swell to the condition that he saw in the scan.

During cross-examination by [Co-Defendant]'s counsel, Dr. Wushensky said that the scan was performed at 3:58 p.m. on February 7, 2009, the day the victim was brought to the hospital. Dr. Wushensky agreed that six to eight hours before 3:58 p.m. would have been before 9:00 a.m. The doctor clarified, however, that he could not be certain that it took this long for the brain to swell, stating that the swelling can occur more rapidly in some situations.

Miranda Parker, an employee with Child Protective Services in Clarksville, Tennessee, testified that she was assigned to the victim's case on February 7, 2009. She went to Vanderbilt Children's Hospital in Nashville where she saw and photographed the victim and spoke with [Petitioner]. Ms. Parker identified the photographs that she took of the victim and said that they accurately depicted how he appeared while lying in the hospital.

The photographs showed bruises on the victim's nose and forehead, bruises to his genitalia and his inner thighs, as well as an abrasion near his anus. Other pictures showed bruises on the victim's left ear, which was swollen and red, and bruising to the victim's right eye. Another photograph

showed that the victim had bruises all over his buttocks, a bruise to his right lower chin, and bruising around his neck. Another photograph showed that the victim had a bruise on his right ear, which was also reddened. Another photograph showed that the victim's left ring finger was reddened.

Ms. Parker testified that [Petitioner] told her that, when the victim had awoken that morning, she fed him cereal. [Petitioner] said that the victim was potty training, so he wore underpants and not a diaper. [Petitioner] told her that she took the victim to use the restroom and that he was whining, so she put him in time out. [Petitioner] told her that the victim "was spanked" several times before she left to go to the grocery store.

Ms. Parker said that [Petitioner] told her that, when [Petitioner] returned from the grocery store, the victim was lying naked face down in his bed. [Petitioner] also told Ms. Parker that the victim had received a spanking on the Tuesday before the Saturday of his hospitalization. She also said that he had fallen out of the Jeep while [Petitioner and Co-Defendant] were "mudding" in their Jeep.

During cross-examination by [Co-Defendant]'s attorney, Ms. Parker testified that [Petitioner] told Ms. Parker that she was the parent who had spanked the victim on the Tuesday before his hospitalization and that she had noticed that her spanking him had caused him bruising. Ms. Parker said that she found [Petitioner]'s demeanor unusual because [Petitioner] was not crying or visibly upset. [Petitioner] was using her cell phone to send and receive text messages during the interview.

Ms. Parker also noted that, during the interview, she told [Petitioner] that the State may place the victim into foster care, and [Petitioner] responded "great; that's another thing I'll have to deal with." When Ms. Parker asked [Petitioner] if she was from Grants Pass, Oregon, [Petitioner] responded, "[Y]eah, because I'm cool that way."

Ms. Parker said that, at one point, [Petitioner] called the victim's biological father, who apparently had little to do with the victim. [Petitioner] did not ask about the welfare of the victim or his prognosis during the interview. Ms. Parker said that she found [Petitioner]'s behavior so odd that she noted it in her report. Ms. Parker said she did not interview or speak with [Co-Defendant].

During cross-examination by [Petitioner]'s attorney Ms. Parker testified that she spent between one and two hours with [Petitioner]. She agreed that she was not an expert in grief and loss. She agreed that she had previously met individuals who did not react emotionally when grieving.

Neil Phillips, a pediatrician at Grants Pass Clinic in southern Oregon, testified that the victim became his patient after the victim was born on March 7, 2007. Dr. Phillips recalled that the victim was "typical" in that he grew appropriately and had a normal number of colds and ear infections. Dr. Phillips said that the victim had to have tubes placed in his ears because of the number of ear infections he suffered, but the doctor said that this was also not unusual. Dr. Phillips said that, while the victim was in his care, [Petitioner] was unmarried. He said that she was the only one who brought the victim to see him. He said that, during the time he treated the victim, he did not suspect any sort of abuse. He said that [Petitioner] also did not mention any concern that the victim was bruising too easily, and the doctor did not see any indication of such a condition.

Adele Lewis, a forensic pathologist with the Nashville Medical Examiner's Office, testified as an expert in forensic pathology. She said that she performed an autopsy of the victim's body on February 10, 2009. Dr. Lewis determined that the victim's cause of death was multiple blunt force injuries and that the manner of death was homicide.

Dr. Lewis said that she found blunt force injuries "all over" the victim's body. She noted that he had injuries to his head and neck, his chest, his abdomen, his back, his buttocks, his legs, and his right arm. When asked which injuries she considered lethal, she said that "the injuries to his head were the most lethal of those injuries." Dr. Lewis noted that it would take a "significant" amount of force to cause the victim's injuries, force equivalent to a "major car wreck" or a "two or three story fall." Dr. Lewis saw bruising patterns on the victim's head that were consistent with knuckles striking the forehead.

Dr. Lewis said that, as part of the victim's injuries, his brain swelled. The problem with the brain-swelling injury was that there was nowhere for the brain to go when it became swollen because it was confined by the skull. Therefore, the brain would lose blood flow, escape down the spinal cord, and the victim of such an injury would become brain dead.

Dr. Lewis noted that the victim's injuries included bruises to his eyelids.  Those injuries led her to look for retinal hemorrhage, or bleeding in the layers inside the back of his eye.  The victim had "many, many of those hemorrhages" inside his eyeballs as well as in the nerves that connected his eyeball to his brain.  Dr. Lewis said that, while she was not certain, it had been theorized that those injuries were the result of acceleration and deceleration injuries, such as when a child is forcefully shaken.  Dr. Lewis said that, in addition to acceleration and deceleration, it was possible these injuries could be the result of the victim's head striking something, considering all of the external bruising to his head.

Dr. Lewis testified that the victim suffered injuries to the right side of his neck.  She classified those injuries as "petechial or pinpoint hemorrhages," which most commonly occur when a victim is choked or strangled.  Dr. Lewis noted that the victim had redness on his fingertips.  She said that this could have been the result of "a lot of things," such as forceful pinching, or from the victim's hand striking an object, or from an object striking the victim's hand.  Dr. Lewis said that it would have been a normal response for a twenty-three-month child to try to shield himself from the blows that he received, and the injuries to his fingers were consistent with this.  Dr. Lewis identified three bruise marks on the left side of the victim's face.  She said that they were consistent with slap or knuckle marks.  Dr. Lewis also testified that the victim's left ear was "very swollen and red" and that there was some bruising to the front side of his ear.  She said that when she bent the victim's ear back she saw that there was also bruising there as well.

Dr. Lewis identified a photograph of the victim's buttocks, scrotum, and penis.  She said that there was bruising to the left side of his scrotum, and "linear or line like bruises to the inside of his thighs."  Dr. Lewis said that these injuries were not consistent with falling down.  Dr. Lewis identified for the jury innumerable red bruises on the victim's buttocks.  Dr. Lewis said that her examination revealed that there was bleeding into the deep soft tissues of the buttocks.  This indicated that there was a significant amount of force used to inflict those injuries.  Dr. Lewis also determined that the injury to the victim's buttocks was "fresh," meaning that it occurred at around the same time as the other injuries.  The buttocks injury was not consistent with a fall.  Dr. Lewis said that the victim had a large blue-purple bruise that went all the way around his anus.  There was also a small fissure, or small tear, at the edge of his anus.  This injury was consistent with the victim's anus being penetrated.

Dr. Lewis opined that a child who sustained injuries as severe as the victim's [injuries] would have "immediately become symptomatic in some way." These symptoms would have been to the extent that a "normal" person would know that something was wrong with the child. The child would have become unconscious, have had seizures, vomited, or experienced a change in his breathing pattern. Dr. Lewis said that it was difficult for her to estimate a time period in which these injuries occurred, especially since the victim survived in the hospital for a day before going on life support for two more days while awaiting an organ donation.

During cross-examination by [Co-Defendant]'s attorney, Dr. Lewis testified that the victim's body had already been "opened" before she conducted his autopsy. She stated that the victim had been pronounced brain dead, so he was eligible to have his organs removed. As such, the victim's thymus gland, liver, gallbladder, spleen, kidneys, pancreas, and intestines had all been removed before the autopsy, and so she could not test or examine those organs. The doctor who removed the organs, Dr. Becher, consulted with Dr. Lewis during the autopsy. Dr. Becher told Dr. Lewis that he thought this was a case of a shaken child rather than a child who had received a blow injury. Dr. Lewis agreed that, with injuries this significant, one would expect to see a skull fracture if it was a blow injury, but there was no skull fracture.

Dr. Lewis said that it was possible that the victim would have had discoloration to his feet, meaning they could have turned bluish, when he was not getting enough oxygen. Dr. Lewis also agreed that, if the victim were asleep, his symptoms might not be noticeable because it would appear that he was sleeping. The doctor maintained that the victim's symptoms would have been immediate after the injury but said that they would have gradually gotten worse. She agreed it was possible that they would have started out as mild symptoms and then gotten worse.

About the anal injury, Dr. Lewis testified that it was consistent with penetration but that she could not be certain that it was a penetration injury.

During cross-examination by [Petitioner]'s counsel, Dr. Lewis testified that Dr. Becher was a specially trained pathologist who specialized in the brain. Dr. Lewis said that she placed the victim's brain in formaldehyde and then asked Dr. Becher to examine it. Dr. Becher examined only the victim's brain and not the outside of his head. Dr. Lewis said that in a traditional shaken child case the brain shows injury but there

is no injury to the outside of the head. Dr. Lewis said that, while the victim's brain was consistent with the brain of a child who had been forcibly shaken, the outside of his head showed external injuries.

Alan Charvis, a homicide detective with the Clarksville Police Department, testified that he interviewed [Petitioner], who gave him a written statement on the day of the victim's injury. Her statement was admitted into evidence. . . .

> [The victim] started to whine so [Co-Defendant] came in [the victim's] room from the bathroom while his head was still lathered with shaving cream.
>
> [Co-Defendant] told [the victim] to go to the "[boo]ger corner" (time out corner). . . . He started whining again so I spanked him not hard. Then I got dressed and stood in [the victim's] room.
>
> . . . .
>
> [The victim] got another spanking by me for whining but not hard. [Co-Defendant] sat down on [the victim's] bed and told him to go stand in front of [Co-Defendant]. [Co-Defendant] and I told [the victim] that he was there for whining & crying.
>
> . . . .
>
> Then I went in [the victim's] room and kissed [the victim] goodbye and went downstairs. I picked up my purse, keys and put my shoes on. As I headed out the door I said "I love you baby" and shut the door behind me.
>
> When I left [the victim's] but[t] was red a light bruise [and] his feet had a little discoloration, but I thought that was from him locking his knees.
>
> It took me 20 mins-25 mins to get to Fort Campbell and another 5-10 mins to get to the commissary. I did the shopping I needed to do and checked out at 12:05 p.m. Then I brought the groceries to my car and left to go to class six

- 12 -

which is right next to the commissary. I walked in got a pack of Budweiser and checked out.

I walked to my car and put the beer in my trunk and left. I then drove home which took another 20-25 mins.

I tried to call [Co-Defendant] [four] times to let him know I was on the way home. He didn't answer.

When I got home I took my purse [and] keys and locked the door, opened the front door and set down my stuff.

I walked upstairs to say I was back and to get help with the groceries. [Co-Defendant] was l[y]ing down in bed and he had just beg[u]n to wake up. I went into [the victim's] room and I said his name and he didn't answer. I called his name again but louder and he didn't answer. I attempted to move him by moving his body and it was limp. His right eye was open and his left eye was shut but stuff was coming out of his eye. He wasn't breathing much.

He was sleeping on his stomach. I picked him up and began to cry. I screamed "O S* *t!" and [Co-Defendant] came running in say[ing] "What! What!" I said, "[the victim's name]!" And I told him to get my purse and keys and walked quickly downstairs. [Co-Defendant] said "I am naked!" and quickly ran downstairs. He said "my son! He's not breathing, get here quick! Hurry! Help!" then said goodbye to the person on the phone. I was sitting on the bottom step holding [the victim] crying trying to talk to him.

I told [Co-Defendant] to get me a blanket for him and then after [Co-Defendant] handed me a blanket he put on his ACU pants and kept checking outside for the ambulance.

Then he said that they were there and I walked outside with my son with a blanket around him to the ambulance.

The detectives asked [Petitioner] if [Co-Defendant] had ever lost his temper with the victim, and she responded "No if [Co-Defendant] ever g[ets] upset he will go mudding or go somewhere in the house away from

- 13 -

both of us to think and collect himself." She was also asked if [Co-Defendant] had ever hit or spanked the victim. She responded "No, he has only spanked [the victim] with his hand, never using any objects or weapons."

Detective Charvis testified that, during his interview with [Petitioner], she appeared "more worried about [Co-Defendant] than she was [about] anything [else]." He said that she repeatedly asked to know what was going on with [Co-Defendant] and she did not ask about the victim until toward the end of the interview.

The detective identified a statement that [Petitioner] later wrote at the District Attorney's Office three years after this killing. Detective Charvis read it to the jury, and it largely comported with the statement that she had given to him. The statement differed in that [Petitioner] said that she called [Co-Defendant] fourteen times while at the grocery store. It also differed in that she said that, after she found the victim listless in bed and [Co-Defendant] came into the room, she asked him "what the hell happened?" She said that [Co-Defendant] responded that he did not know. [Petitioner] also said in her second statement that [Co-Defendant] told the 911 operator that he "loved [his] son, please help" and that he began to cry as she brought the victim downstairs. [Petitioner] said that [Co-Defendant] kept running outside looking for the ambulance while she rocked the victim, telling him that he was not alone, that Mommy was there, and that she loved him. [Petitioner] said that, when emergency personnel loaded her limp son on the ambulance bed, she sat "bawling" her eyes out.

Detective Charvis said that he subpoenaed [Petitioner]'s phone records. They showed that [Petitioner] had called [Co-Defendant] at 10:38 a.m., 10:47 a.m., 11:00 a.m., and 11:56 a.m. Her receipt showed that she checked out of the commissary at 12:05 p.m. She then called [Co-Defendant] at 12:14 p.m., 12:18 p.m., and 12:34 p.m.

Detective Charvis testified that he interviewed [Co-Defendant] twice on February 7, 2009, and that he cried throughout the interviews. During the first interview, [Co-Defendant] said that he had put the victim in time out and had given the victim a "couple of swats" for whining that day. He described them as "light." [Co-Defendant] described the victim as a "smart boy" but said that they were "just trying to work on him."

During the interview, [Co-Defendant] said that [Petitioner] left and went to the store. He said she was gone approximately two hours. [Co-Defendant] said that, while she was gone, [Co-Defendant] took the victim out of the corner and talked to him for "thirty minutes" telling him what he had done wrong. [Co-Defendant] then took the victim to the potty because he was using sign language to express that he had to urinate. The victim did not use the potty, so [Co-Defendant] said he decided to give the victim a bath because he was dirty from eating breakfast. [Co-Defendant] put bubbles in the bath, and he recalled that the victim was "happy as ever," asking where his mama was. [Co-Defendant] said that he went to get the victim pajamas for his naptime, which was around noon, and he was going to lay him down to sleep. [Co-Defendant] said that, as he came back into the bathroom, he saw the victim "like lifting himself up from being like underwater." [Co-Defendant] noted that the victim was "smart as hell" and "really independent."

[Co-Defendant] told Detective Charvis that, when the victim lifted his head from underwater, he was coughing but not whining or crying. [Co-Defendant] picked up the victim and tapped him and he coughed a little bit. [Co-Defendant] said he dried the victim off and laid him in bed. [Co-Defendant] said he stayed with the victim for twenty to twenty-five minutes and allowed the victim to fall asleep. [Co-Defendant] said that he then went and took a shower, checked on the victim who appeared to be sleeping normally, and then went to take a nap. When [Petitioner] returned, she screamed the victim's name. [Co-Defendant] knew from the way that she said the victim's name that something was wrong. [Co-Defendant] described how he went to the victim's room and tried to revive him. He said that the victim was "totally limp" but was breathing and had a heartbeat, so he and [Petitioner] were confused about his condition. He said that they immediately called 911.

[Co-Defendant] opined that the victim's injuries were a result of the victim slipping in the bath. He said he was only gone from the bathroom for a minute or a minute and a half. [Co-Defendant] asked to see the victim.

Detective Charvis reminded [Co-Defendant] that the interview was being recorded and asked [Co-Defendant] to tell the truth. He reminded [Co-Defendant] that the victim suffered bruises and knots on his head and bruises on his buttocks. [Co-Defendant] opined that the bruises on the victim's buttocks were a result of his learning to pull up his underwear or

- 15 -

because he had been falling out of [Co-Defendant]'s truck. He said that the victim's bottom would get red from their spankings but said that they were not "like hard spankings." He noted that the spankings would "go up in numbers" if the victim kept "being bad and won't stop."

Detective Charvis said, "So how do you explain . . . a lick on his head . . . [and] that his eyes were all messed up." [Co-Defendant] said he did not know. Detective Charvis told [Co-Defendant] that either [Co-Defendant] or [Petitioner] had done something to the victim. [Co-Defendant] said that the victim had fallen "out of [his] truck so many times, it's all right. Boys are able to you know, boys got to be boys. You know how it is, when you grew up? You would fall down, you know, hurt your head?" [Co-Defendant] said that he had never hurt the victim. He expressed frustration at not knowing how the victim was doing or how [Petitioner] was handling the situation. [Co-Defendant] said that he did not see [Petitioner] hurt the victim in any way and only saw her give him some spankings. He agreed that no one else had control over the victim other than himself and [Petitioner].

In a second interview, about thirty minutes later, Detective Charvis informed [Co-Defendant] that the victim was still alive and that the doctors were running tests to try to find out what happened to the victim. Detective Charvis informed [Co-Defendant] that there was a "slap mark" on the victim's face and asked how that occurred. [Co-Defendant] informed Detective Charvis that it was not "a slap mark" and that the detective would have to "ask [the victim]" how he got the mark. Detective Charvis informed [Co-Defendant] that the victim's anus had been penetrated. [Co-Defendant] said that the victim's anus had never been penetrated and that he was "tired of [Detective Charvis] attacking him."

During cross-examination by [Co-Defendant]'s counsel, Detective Charvis said that [Co-Defendant] cooperated with him fully during the interview. He said that [Petitioner] did not appear upset or cry while she was writing out her eighteen-page statement. She did not ask about the victim until toward the end of the statement, and she did not seem concerned about him. Detective Charvis agreed that [Co-Defendant] did appear upset when he gave his statement and also asked to see the victim on multiple occasions. He agreed that he did not see any pictures of groceries in the crime scene photos.

- 16 -

Detective Charvis testified that the police collected items from [Petitioner and Co-Defendant's] residence. Some of those items, a shirt, a pipe, a rag, paper towels, and swabs from firearms, were sent to the Tennessee Bureau of Investigation ("TBI") for testing. A rape kit performed on [Co-Defendant] was also sent to the TBI for testing, along with sheets and blankets.

During cross-examination by [Petitioner]'s counsel, Detective Charvis testified that it was not important to his investigation whether the Defendants' groceries had come into the home or were left in the car. He said that a suspect crying in his presence did not mean that they were genuinely upset.

[Co-Defendant] recalled Ms. Batson [to the stand], who added that, while [Petitioner] was at the hospital with the victim, [Petitioner] remained about fifteen feet from the bed, never going over to the bed, touching her child, or crying. Ms. Batson said that [Petitioner] never expressed concern about what was wrong with the victim.

[Co-Defendant]'s counsel then read a portion of the medical records into the record. It stated:

> I spoke with the Nursing Staff at bedside this morning, who reported [that Petitioner] continues to have a flat affect.
>
> . . . .
>
> [Petitioner] asked for how she could get a copy of the patient's medical records for herself. [Petitioner] said she knew the case was going to [c]ourt and all she wanted was to have a copy. I provided the [Petitioner] with the number to the medical records here and encouraged her to call after one week so the draft documents could be signed off.
>
> . . . .
>
> [Petitioner] asked if I knew how she could get rid of the family truck and other belongings. The mother said she knew that they would need to sell things, so she wasn't sure how to go about this. We talked about her posting signs in the buildings on post and putting an ad in the paper.

- 17 -

[Petitioner]'s attorney also presented a portion of the medical records from Vanderbilt. That record indicated that [Petitioner] was "grieving appropriately during this time evidenced by her crying, holding the [victim's] hand and writing the [victim] a goodbye letter. [Petitioner] met with the [c]haplain as well."

The jury convicted [Co-Defendant] of aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and aggravated sexual battery. It convicted [Petitioner] of aggravated child abuse, first-degree felony murder committed during the perpetration of aggravated child abuse, aggravated child neglect, first-degree felony murder committed during the perpetration of aggravated child neglect, and facilitation of aggravated sexual battery.

*State v. Joshua R. Starner and Caitlyn Metz*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *1-14 (Tenn. Crim. App. Apr. 20, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016). "The trial court sentenced [Co-Defendant] to life in prison for the felony murder conviction and fifteen years for each of the remaining two convictions, aggravated child abuse and aggravated child neglect." *Id.* at *1. "The trial court ordered that [Co-Defendant]'s fifteen-year sentences run concurrently with each other but consecutively to his life sentence." *Id.* "The trial court sentenced [Petitioner] to the same sentences but ordered that all her sentences run concurrently." *Id.* This court affirmed the convictions on direct appeal. *Id.*

*Post-Conviction Hearing*

Petitioner filed a post-conviction petition and an amended petition through counsel, alleging that she was denied the effective assistance of counsel because trial counsel (1) filed a deficient pretrial motion to sever; (2) abandoned the pretrial motion to sever; (3) failed to file a comprehensive bill of particulars; (4) failed to challenge the child neglect statute as unconstitutionally vague; (5) failed to investigate; (6) failed to consult with and advise Petitioner; (7) failed to obtain expert witnesses; (8) failed to adequately and effectively challenge objectionable jury instructions; (9) failed to tender special jury instructions; (10) failed to object to improper prosecutorial argument and improper argument by Co-Defendant's trial counsel; (11) failed to present a defense; (12) failed to engage in pretrial negotiations; and (13) failed to question potential jurors. Petitioner also argued that she was denied due process because the State (1) withheld favorable evidence in violation of *Brady v. Maryland*; and (2) engaged in improper prosecutorial argument.

- 18 -

At the post-conviction hearing, trial counsel testified that he had over thirty years' experience as a criminal law attorney and was retained by Petitioner's mother to represent Petitioner. He said that Co-Defendant was initially charged with the victim's murder and that Petitioner was charged three years later. He did not recall how many times he spoke with Petitioner before trial. Trial counsel stated that he did not keep any time records on criminal cases where he was retained. He recalled "vaguely talking to [Petitioner] about the case" but did not remember where or how that occurred. He said, "I'm sure I sent a copy [of discovery] to her. If she was in Oregon, I'm sure I did that. We probably talked at length over the phone. We probably talked about it when she was in my office."

Trial counsel did not recall if he filed pretrial motions in Petitioner's case but agreed with post-conviction counsel that "part of [his] obligation of representing a person charged with a serious crime like murder" included "the need to file pretrial motions[.]" He agreed that he filed a pretrial motion to sever just two weeks after Petitioner was indicted, the timing of which suggested that "it was important to try to get a severance[.]" Trial counsel agreed that he did not want Petitioner sitting next to Co-Defendant at trial. He explained,

> [M]y defense was going to be that [Co-Defendant] did it. And the jury was going to be mad, and I didn't want to be sitting at the same table if I could avoid it. Because our defense was to try to throw off on the ex-husband. And if we were at separate trials, then the jury could have taken out all of their anger on him. And then maybe after that I could have cut a deal with the State for something less.

Trial counsel also filed a Motion to Dismiss based on lack of evidence, which the trial court denied. He agreed that he told the trial court that he was filing the motion "at [his] client's insistence" and that the trial court would not rule on the motion until it learned what the defenses would be. Trial counsel agreed that, in Co-Defendant's counsel's opening statement, she "point[ed] the finger at [Petitioner]." He agreed that Co-Defendant's defense was that Petitioner's lack of emotion indicated that she was the one who killed the victim. Trial counsel stated that he felt like this defense was "out of the blue." Trial counsel agreed that, after he learned what Co-Defendant's defense theory was, he "abandoned" the motion to sever.

Trial counsel stated that, if he saw a need, he would investigate mental health issues. He recalled Petitioner having a "flat affect" and said that she "seem[ed] to lack emotion." He explained, "I never saw anything when I talked with [Petitioner] that indicated to me that she had mental problems or emotional problems that warranted an evaluation or an investigation. I never saw that. She had a flat affect." Trial counsel

- 19 -

believed her lack of emotion would make her a poor witness. Trial counsel agreed that "there was a lot made of her flat affect at the hospital and . . . at other times as well" by the State and Co-Defendant. Trial counsel agreed that, when he had a client with a "flat affect," it would "help to know whether they were suffering from mental illness[.]" He did not recall whether Petitioner told him that she was admitted to Middle Tennessee Mental Health Institute ("MTMHI") shortly after the victim's death, that she attempted suicide, or that she sought psychiatric treatment once she moved to Oregon. Trial counsel did not recall whether he asked Petitioner about her mental health history. Trial counsel did not interview her psychiatrist or grief therapist from Oregon and did not obtain any records from MTMHI. The following exchange occurred:

> Q. If you were aware that she had -- was diagnosed with depression, Disassociation Disorder, anxiety, and Post-Traumatic Stress Disorder that might be something to explore in preparing a defense for her. Right?
>
> A. If that was the only defense that I had, yes.
>
> Q. Okay. And it might be something that would rebut the evidence that she showed a flat affect at the hospital, that was so damaging against her at trial?
>
> A. I don't -- yes. That -- I don't recall there being any information about people having a flat affect. I felt like [Co-Defendant's counsel] just brought that up somewhat out of the blue. I was not expecting that[.]

Trial counsel agreed that a criminal defense attorney should "continue to investigate a case" and that the "investigation involves evidence that [counsel] might anticipate by the prosecutor" and by "Co-[D]efendant's counsel[.]" Trial counsel did not remember if he presented any defense witnesses at trial but agreed that a defense attorney had a duty to interview both prosecution and defense witnesses. Trial counsel recalled speaking with "whoever authored the autopsy report" but did not speak with any other medical personnel. Trial counsel did not interview Ms. Parker, the social worker who testified against Petitioner. Trial counsel stated, "I don't recall if I talked to anybody. I was probably focused on cause of death."

Trial counsel spoke to "two or three" police officers but did not remember their names. He did not interview any witnesses from Oregon whom Petitioner identified regarding her good character as a mother. Trial counsel remembered receiving some letters from potential witnesses from Oregon and believed "there might have been offers to come and testify." Trial counsel did not follow up with any of these letters. He did

not speak with any witnesses who could testify as to how she was grieving the loss of her child. Trial counsel subpoenaed no one as a witness for Petitioner.

Trial counsel testified that he knew Co-Defendant was in the military but did not investigate his military records.[1] He explained, "My defense was that [Co-Defendant] did it, and that [Petitioner] was at the Commissary when the child was killed." Trial counsel agreed that, if Co-Defendant's military records showed that he had a tendency to be violent, it would have been important to investigate that.

Trial counsel agreed that, during opening statements, he stated, "She didn't kill that baby. She loved [the victim]." Trial counsel agreed that he did not present any proof at trial that Petitioner loved the victim.

Trial counsel stated that, in his discussions with the prosecutor,

[The prosecutor] told me that he considered for a while the fact she didn't have anything to do with the death of [the victim], that every other assistant [district attorney] in the office was fussing at him for not charging her.

So, yes, he told me why he didn't charge her initially. Because he didn't think she had anything to do with it, initially.

Trial counsel stated that approximately ninety-eight percent of his cases "settle" instead of going to trial and that he went to trial approximately four times per year. He stated that Petitioner's mental health issues likely would not have affected settlement negotiations with this particular prosecutor.

On cross-examination, trial counsel stated that he did not see anything in Petitioner that caused him to think he should request a mental health examination. He agreed that some people have a flat affect and that "that's just the way some folks are[.]" Trial counsel agreed that the proof showed that only Petitioner and Co-Defendant had access to the victim around the time of his death. He stated that interviewing any of the medical professionals in the case would not have changed his defense theory. Trial counsel stated that he asked Petitioner several times about possible abuse from Co-Defendant and that he "never got so much as an inkling" except for "one incident where [Co-Defendant] spanked the child too hard[.]" He agreed that the prosecutor told him

---

[1] In addition to the military records detailing Co-Defendant's dishonorable discharge, Co-Defendant's medical records indicated that he was treated at a military hospital or clinic. Thus, we will refer to the discharge records and the medical records collectively as the "military records."

- 21 -

that, if Petitioner admitted that Co-Defendant abused the child and that she knew about it and did nothing, Petitioner may have received a favorable settlement offer. Trial counsel stated that he repeatedly explained to Petitioner that she had to admit Co-Defendant abused the child or she would go to trial. Petitioner never agreed to make that admission. Trial counsel said that he believed Petitioner told him what she knew about what happened.

Trial counsel stated that evidence from character witnesses in Oregon who saw Petitioner two months before the murder would not be relevant. He did not recall Ruth Converse asking him to subpoena her so that she could testify on Petitioner's behalf. He stated:

> What I felt was the jury was going to be mad, and [the victim] had bruises of various ages literally from the top of his head to the bottom of his feet. If I started putting up witnesses to say what a great mom she is they might even be more offended instead of less offended. That was my fear.
>
> And then they would be subject to cross-examination with the photographs of [the victim]'s body.

Trial counsel stated that he would not have put Petitioner's suicide attempt in front of the jury "[b]ecause it's easy enough for [the prosecutor] to say she tried to kill herself because she killed that baby." He said that he would not have put on proof of Petitioner's Dependent Personality Disorder because it would not rise to the level of insanity and agreed that the prosecutor could "argue to the jury, basically, well, she has a Dependent Personality Disorder. So[,] she just sat there and watched him do it and covered up for him because that's what he wanted."

Trial counsel testified that he did not know what he would have to do to get army psychiatric records. He said that Petitioner never mentioned any domestic violence or emotional abuse against her or the victim, except for "a little over-disciplining in the spanking department." Trial counsel said that, if Petitioner had told him about domestic violence, he would have thought about Battered Wife Syndrome as part of his defense strategy.

On redirect examination, trial counsel agreed that, when he has had clients who were victims of domestic violence, they "often ha[d] difficulty revealing that[.]" Trial counsel stated that he never spoke to anyone in Oregon to ascertain whether Petitioner was a domestic violence victim. The following exchange took place:

- 22 -

Q. Now, seriously, as a professional attorney, you can't really render a professional opinion today on whether you would use something until you've had an opportunity to obtain it and review it[,] right? . . . [Y]ou're not going to sit here today and say I would use something or not use something without having had an opportunity to review the records[,] right?

A. Correct.

Q. In fact, if you do -- if you are aware of mental health issues, you obtain the records, and you review them. Right?

A. Yes.

. . . .

Q. You might even consult with another expert and say what do you think about this, right?

A. Yes.

. . . .

Q. And, at a minimum, you'd want to talk to the psychologist -- the therapist who actually conducted the evaluations and the treatment of your client. Right?

A. Yes.

Q. And, of course, we know none of that happened in this case?

A. That's correct.

Q. Because as you said you didn't see anything when [you] met with [Petitioner].

A. Correct.

Q. And you may have only met with her one time, right?

A. Met with her, talked with her. I just never saw anything that indicated it. But, yes.

- 23 -

Q. But your meetings with her may have been limited to one time, right?

A. I don't remember how many times. It wasn't many.

Trial counsel did not recall Petitioner having a "forensic hypnosis evaluation" or Petitioner asking trial counsel to send a forensic hypnosis report to the prosecutor. Trial counsel agreed that Petitioner tried "over and over to . . . convey that she had no hidden memory or know anything about what [Co-Defendant] did or didn't do to [the victim]" and that the forensic hypnosis report was her effort to explain that to the prosecutor.

Sheri Phillips, Co-Defendant's trial counsel, testified that she came onto the case close to trial. She agreed that her theory of the defense was that Petitioner had inflicted the victim's injuries. Ms. Phillips recalled stating in her closing argument that Petitioner "was so unemotional that her mannerisms and snide comments were inappropriate" and that she was texting "the whole time" and "making snide comments" to the Department of Children's Service ("DCS") worker. Ms. Phillips believed that she received that information in discovery "well in advance of trial." She stated that she interviewed people regarding these comments "[t]o find out more about why [Petitioner] acted that way." She agreed it was a "central part" of Co-Defendant's defense theory that Petitioner acted and spoke in an inappropriate way.

Ms. Phillips testified that there was no one besides Petitioner and Co-Defendant who had access to the victim on the day of the murder. She did not recall ever speaking to trial counsel about what to expect at trial, though she remembered one meeting together with the prosecutor to make sure they both had discovery. Ms. Phillips agreed that there was "no plan for a joint defense in this case." Ms. Phillips remembered interviewing the medical examiner, the radiologist, a nurse, police officers, the DCS workers, and her client prior to trial. She stated that she met with Co-Defendant "over a dozen" times.

On cross-examination, Ms. Phillips stated that the witnesses' trial testimonies were consistent with the information in discovery. She said that she did not engage an expert witness because "there was [not] any other cause that could have been the cause of [the victim's] death." She said that she did not file a motion to sever; she did not want it severed because she "wanted [Petitioner] in on this[.]"

On redirect examination, Ms. Phillips agreed that, because she had interviewed the medical examiner, Ms. Phillips was able to ask questions about the timing and cause of death. She agreed that trial counsel did not ask the medical examiner any questions. She

agreed that investigating the time of death was something important to explore "to give effective assistance" to her client.

Ruth Converse testified that she had been a "home visiting nurse" with Josephine County Public Health in Oregon for twenty years. She stated that she had asked to testify at the post-conviction hearing on behalf of Petitioner and that she had also asked trial counsel if she could testify at trial. Ms. Converse stated that she had testified in many cases in the past, both for and against the State. She stated that she had been involved in cases in the past where a child had died. Ms. Converse stated that she met Petitioner through Medicaid, which referred every pregnant woman in the county to Ms. Converse. She began meeting with Petitioner when Petitioner was pregnant with the victim, and they discussed nutrition, labor and delivery, breast-feeding, and newborn care. She worked with Petitioner and the victim until the victim was almost two years old. Ms. Converse testified:

> One of the things I charted was [Petitioner] was very open to everything I said. She wanted to do everything exactly right. Very concerned. If she had any -- anything that she thought -- oh, shouldn't he be doing this yet? I'd have to calm her down and say some kids do it really early, and some do it really late. But she wanted to make sure she was doing everything exactly the way she was supposed to so that he would do things right. . . . I just wanted to voice how -- what a protective and concerned mama she was.

> So[,] she made her own baby food. She was -- she didn't start him on -- we like to progress and do solids. She was afraid of him choking. So I had to encourage her, it's okay to start offering him a little more foods that he can pick up. She didn't want him to choke. She didn't want anything bad to happen to him.

> . . . .

> I also put in here that she talked to him all the time. She read books to him every night. She was just a very involved mom. Which I didn't always see. I saw lots of moms. But with her she was a very involved mom, following everything that I suggested. She was on it and doing it.

Ms. Converse stated that she never had any concerns regarding Petitioner's treatment of the victim and that they had "[v]ery good bonding. He would light up when he saw her face." Ms. Converse never saw bruising or injuries of any kind. She said that

- 25 -

she was shocked when she learned Petitioner was charged with the victim's murder "[b]ecause that [wa]s not the person [she] knew."

Ms. Converse said that she learned the name of Petitioner's trial counsel and contacted him to ask to be subpoenaed to court. She said that, as a county employee, their legal department needed a subpoena to "clear [her] to be able to talk." Trial counsel told Ms. Converse that he would not need her and would not use her if she came. She requested that trial counsel find an expert in child brain development. She explained to him that,

> [T]he reason we have children rear-facing in car seats is because their brains don't have a myelin sheath that covers it. You get those -- you get -- they grow successively. You don't get your last one until you're in your [thirties].

> But that's why they have -- one of the reasons they have to be rear-facing is because if their head gets bounced around they're much more likely to swell faster and bleed faster and react faster than -- so I just wanted him to have someone explain that to the jury.

Ms. Converse also wrote to trial counsel to explain to him that Petitioner was one of "the top" mothers she had worked with and was "an amazing mama[.]" She also sent trial counsel a list of questions he should ask witnesses to make sure certain issues were addressed at trial. She said, "I knew [Petitioner], and there [was] nothing inside [Petitioner] that could have been involved with that."

Ms. Converse stated that she had worked with many families who had lost a small child. She agreed that a parent who just received news about the death of a child can have "a wide range of different types of reactions and responses." She said, "I have ones who just withdraw. I can't get a response from them. . . . [P]eople respond differently based on their own personality and based on their own experiences." Ms. Converse explained that her opinions on parental reactions to the death of a child come from her bachelor's degree in nursing, her training as a psychiatric nurse, and her training in domestic violence. She agreed that lay persons would also know that people react differently to traumatic events.

On cross-examination, Ms. Converse stated that, in addition to Medicaid referrals, she gets referrals from doctors' offices for patients with traditional insurance. She agreed that Petitioner was only around Co-Defendant for a few weeks prior to marrying him. Ms. Converse stated that, although Petitioner and Co-Defendant had gone to high school

together, they had not been around each other long enough for Petitioner to determine whether he was abusive.

Ms. Converse agreed that Petitioner was "competent" and did not have "diminished mental capacity." She said that Petitioner's behavior during the home health visits was "appropriate." Ms. Converse stated that Petitioner's second child was removed from her in Oregon but that Ms. Converse disagreed with the court's decision and went to court to express that. Ms. Converse denied that her passion for this case was a result of her working with Petitioner's mother.

Lauranne DeHoff Thatcher testified that she was a retired mental health professional from Oregon and that she worked with her local community mental health program for thirty years. She stated that she worked almost exclusively with sexual abuse victims for about ten years and worked in crisis psychiatry with suicidal and homicidal clients for five years.

Ms. Thatcher stated that she knew Petitioner for about ten years through Petitioner's mother, her co-worker. She said that she saw Petitioner and the victim twice a week after the victim was born. She testified:

> Well, I was very, very impressed with [Petitioner] as a mother because she was always patient, always calm. Things are not like that at my house. Everyone is yelling at everyone else. But she just had a very sweet, gentle way about her with [the victim]. And I was so taken with her as a mother that I thought, well -- you know, my daughter was getting ready -- or actually had her own son. And I thought, well, I could learn some lessons from -- you know, how -- because [the victim] was so well-behaved and so good and happy and sweet. And I never heard a voice raised. . . . [S]he was very soft-spoken, kind, encouraging. . . . And I just noticed that there was no yelling.

Ms. Thatcher never saw any anger, acts of violence, or cruelty from Petitioner towards the victim or anyone else. She never saw any behavior between Petitioner and the victim that caused her concern, and she never saw Petitioner discipline the victim in an inappropriate way. She agreed that she was not around Petitioner and the victim for the seven weeks after Petitioner moved to Tennessee.

Ms. Thatcher stated that she sent a letter to trial counsel, at the request of Petitioner's mother, stating her opinion of Petitioner as a mother and her concerns that Petitioner had PTSD after the death of the victim. Ms. Thatcher recalled speaking with trial counsel on the telephone: "I said[,] [']I was hoping you could help me understand

why you're not asking for a separate hearing for [Petitioner] from [Co-Defendant] because she really had nothing to do with it. And also it would be in her best interest not to be tried along with this person.[']" Ms. Thatcher stated that she did not discuss Petitioner's mental health on the phone with trial counsel because she did not have a chance. She explained, "He didn't want to hear anything from me." She agreed that she detailed her mental health concerns in her letter to trial counsel.

On cross-examination, Ms. Thatcher stated that she only met Co-Defendant once and "thought he was a bit peculiar." She explained that she had to pass a series of exams and tests to become a "mental health examiner." She agreed that the precipitating event to Petitioner's PTSD could have been a failure to prevent the victim's murder and that she did not actually know what caused the PTSD. Ms. Thatcher believed Petitioner "was in denial for so long" because she wanted "a happy family" with "a father for [the victim]."

On redirect examination, Ms. Thatcher said that she was prepared and willing to be a witness at trial if called and that she prepared the letter "explicitly for the use of [Petitioner's] defense for her attorney[.]"

Deborah Ann Maranov testified that she had known Petitioner since she was born and was Petitioner's godmother. She said that she spent "lots of time" with Petitioner and the victim doing different activities. Ms. Maranov observed Petitioner "right down there on the floor, you know, crawling with him, reading to him, playing with him, nursing him[,] . . . teaching him, encouraging him." She said that Petitioner's apartment was very clean with "[l]ots of baby toys." Ms. Maranov never saw Petitioner get rough, aggressive, violent, or lose her temper with the victim. She observed good eye contact, "lots of hugs and kisses," "[a] lot of affection[,]" and "[r]eally good nutrition. She made her own baby food." Ms. Maranov agreed that she did not see Petitioner and the victim "for a month or two" after Petitioner moved to Tennessee.

Lisa Reaves Holley testified that she had known Petitioner since they were in fourth grade and that they grew close after high school. She said that Petitioner was "always very quiet, never got in trouble at school, very well-mannered, soft-spoken, never [had] any kind of aggression." Ms. Holley stated that she never saw Petitioner angry and that she "was always very happy." She testified that, when Petitioner was expecting, she spoke to Petitioner every day, helping her set up a nursery, passing down baby clothes, getting coffee, watching movies, and playing board games. Ms. Holley stated that Petitioner was excited about her pregnancy although nervous about being a single mom. She observed Petitioner with the victim from the time he was born until they moved to Tennessee. She explained:

They were very close. She was a very loving mom, very nurturing. She breastfed him until she couldn't anymore because of his milk allergy. And then at that time he was on soy formula, I believe.

I remember her not wanting even baby foods. I remember her not even wanting to buy jar baby foods for him. She wanted to give him all the best, all the natural foods for him. She meal-planned. She'd have like a chalkboard thing that she kept up and meal-planned and did meals.

She was always reading to him. She had a very well -- her apartment was very nice. When she got her apartment I helped her decorate her apartment and helped her put together his room.

. . . .

[Petitioner] had pictures of [the victim] and her together. He had his own bedroom. There [were] pictures of him and her in the bedroom. He had a very nice room. Crib and dresser. She played lullaby music for him at nap time and bedtime.

[S]he was always very good about keeping him on a routine and keeping him at a set schedule for nap time and bedtime. She was always good about that.

. . . .

[After] she started doing college classes, . . . [s]he put him in a brand new, very nice day care center. I even remember her telling me about some day care she interviewed and them being dirty or not cleaned. She didn't get a good feeling about them. So I know she wanted the very best for him.

Ms. Holley testified that she never observed Petitioner discipline the victim in an inappropriate way or be rough with him. She said she never heard Petitioner yell at any of Petitioner's children or lose her temper. She recalled Petitioner teaching the victim sign language when he was a baby and posting flashcards around the house to label things.

Ms. Holley knew of Co-Defendant from high school but did not know him well. She agreed that she was not in Clarksville at the time of the murder but stated that she did speak to Petitioner on the phone and through text after Petitioner moved to Tennessee. Ms. Holley recalled asking trial counsel if she could be a witness for Petitioner at trial.

- 29 -

She explained that she was "sick" when she heard Petitioner was arrested because it "wasn't the [Petitioner] that [she] knew[.]"

On cross-examination, Ms. Holley stated that she had one phone conversation and several texts with Petitioner after Petitioner moved to Tennessee. She said that Petitioner mentioned she and Co-Defendant were having some parenting differences and that they were "seeking counseling and that [Petitioner] was trying to get help for [Co-Defendant]." Ms. Holley asked Petitioner if everything "was okay," and Petitioner "got a little bit quiet." Ms. Holley asked Petitioner if Co-Defendant was hurting her or the victim, and Petitioner stated "Well, we're getting help for things, and we're seeing a counselor. We just have parenting differences." Ms. Holley questioned Petitioner because "when [Petitioner] said she was okay, she didn't sound okay." Ms. Holley stated that she told some of their mutual friends about the texts and phone conversations and asked if anyone else had spoken with Petitioner. She said, "of course, we were all worried" because Petitioner had moved so far away.

Janet Rich testified that she had known Petitioner since Petitioner was three years old and had seen her two or three times per week when Petitioner was growing up. She said,

> She was a really sweet, loving, nurturing person from the time she was just a small child. She was the kid that anytime anybody got hurt, she had a Band-aid on them, an Ace bandage nurturing them, hugging them, getting help from parents. You know, running in, somebody needs help. So she's always been that way. And as she got older she's still that way.

Ms. Rich stated that Petitioner was never a violent, angry, or aggressive child and that remained true as she got older. She said that, after the victim was born, she saw Petitioner and the victim "a couple times a month[.]" Ms. Rich stated that the victim "was a happy little boy" and that Petitioner "loved him dearly. She was very attentive. . . . [A]t her house, there was -- it was like he was the center of her world." Ms. Rich noticed lots of educational toys and tools at Petitioner's home. She recalled,

> I was over . . . one time with [the victim], and he was acting a little naughty. [Petitioner] just took him and talked to him. Sat him down and said, "This is not good behavior. You can't act like this." There was no anger. There was no -- she talked to him like he was growing up. He was still tiny, but there was no meanness at all.

Ms. Rich testified that Petitioner was even more loving and caring with her second child, "[i]f that's possible." Ms. Rich stated that Petitioner's mother asked her to write a

letter to trial counsel as a "character witness." She said that she was "absolutely" willing to come from Oregon to Tennessee to testify for the trial and made definite plans for travel. Ms. Rich explained that Petitioner's mother "called and said[, 'trial counsel] says he doesn't need you[,']" so Ms. Rich remained in Oregon.

Ms. Rich said that, based on her first impression of Co-Defendant, she did not care for him. She stated, "But I only met him one time for a few hours." Ms. Rich said that Petitioner wanted a "stable, loving family" and saw that opportunity with Co-Defendant. She agreed that she was not in Clarksville at the time of the murder and did not have personal knowledge of what occurred. Ms. Rich stated that, when she heard of Petitioner's arrest, it "absolutely" did not correspond with the behavior she had observed in Petitioner and said, "[N]o one is going to convince me that in seven weeks she could change that much."

On cross-examination, Ms. Rich acknowledged that she had "zero" mental health expertise. She agreed that, when she met Co-Defendant at a Christmas party, "his sexualized behavior in the crowd was inappropriate[.]" Ms. Rich recalled that a court in Oregon removed Petitioner's daughter from her after Petitioner was charged in the death of the victim.

Petitioner testified that, at the time of trial, she was working on her bachelor's degree in psychology at Southern Oregon University with three semesters left before graduation. She stated that she had no training in criminal justice or the legal field. Petitioner had never been arrested before and had no knowledge or experience regarding the criminal justice system.

Petitioner said that she had two more children after the victim died. Petitioner stated that her daughter was taken from her in Oregon because she was charged with the murder of the victim and not because she had abused her daughter.

Petitioner met trial counsel in February of 2012 when he stopped by the jail to introduce himself. She said that she met with him briefly when she was released on bond before she returned to Oregon and met with him "[t]wo or three times" after that for about an hour each time to review discovery. She did not recall emails with trial counsel but said that trial counsel sent her "no more than two letters" over the course of a two-year period. Petitioner recalled speaking with trial counsel on the phone.

Petitioner knew of one instance where trial counsel asked the State for a plea deal prior to trial, but the State refused to negotiate. She recalled the State asking her to make "a truthful statement" for them to consider negotiating, but she said that she was already telling the truth. She said that, while the jury was deliberating, trial counsel

recommended to Petitioner that she seek a plea deal, so she agreed to let him discuss it with the State. When trial counsel returned, he said, "Nope, he's not budging." Petitioner said that the theory of her case was that Co-Defendant murdered the victim while she was at the commissary.

Petitioner told trial counsel that several people asked to come forward and testify to her character as a mother. She provided trial counsel with names of people ready and willing to testify and said that she could get their contact information. Petitioner explained to trial counsel that she had "some mental health diagnosis" since the victim's death but did not assert that she was "crazy" or "not in [her] right mind." Petitioner said her mental health issues were never mentioned at trial. She said that her care for the victim was never mentioned at trial but instead that she "had a flat affect, that [she] didn't care, that [she] was uncompassionate."

Petitioner stated that, two months after the victim's death and well before she was charged, she became very depressed and cut herself. She explained, "I just lost my son. He was my entire world. I had nothing to live for if my son's not there. I didn't have any other kids. He was my only kid." Petitioner did not believe she was a suspect at the time of this suicide attempt. She said that she was on the phone with a friend when she cut herself, and her friend called 911. Petitioner was involuntarily committed to MTMHI. She stated that she told trial counsel about this incident.

After Petitioner was released from the hospital, she returned to Oregon and received the mental health diagnoses of depression, severe PTSD, anxiety disorder, panic attacks, and dissociative disorder. Petitioner sought therapy and medication. She stated that she was sure her PTSD developed from "losing [her] son." She testified that she did not develop PTSD because she hurt, killed, or neglected her son.

Petitioner stated that she was nineteen when the victim was born and that she was nervous and excited about the pregnancy. Petitioner agreed that she made the victim's baby food, that she used flashcards with him, and that she taught him sign language. She said that she went to quite a few daycare centers before she picked one.

Petitioner testified that she knew Co-Defendant from high school and that she "started talking to him in August of 2008." She said that Co-Defendant seemed interested in the victim and that she believed he cared about them. About two months later, they were married. She said that she believed it would "be an opportunity for [the victim] to have a dad." Four weeks after she arrived in Tennessee, the victim was killed.

Petitioner was proud of Co-Defendant's army service, and she believed it was a stable career. She asked trial counsel if he was going to get any military records prior to

trial, but she did not see the army records or discuss their contents with anyone until the day of the post-conviction hearing. She said she had no idea that Co-Defendant had been recommended for administrative discharge or reassignment. Petitioner stated that, if she had known that Co-Defendant was violent, "as described in some of these records," she "would have gotten as far away from him as [she] could have."

Petitioner recalled the prosecutor pointing out at trial that she left the groceries in the car when she arrived home. She explained that she left the groceries and went inside to get Co-Defendant and the victim because the victim enjoyed helping with the groceries. She stated that she found the victim "doing this weird breathing pattern." She knew something was wrong but did not know what. Petitioner screamed and told Co-Defendant to call 911. She wrapped the victim in a blanket to try and keep him warm, and she sang and rocked the victim. When the ambulance arrived, she rode with the ambulance to the hospital. Once at the hospital, there were "[a] ton of medical personnel, like doctors and nurses" surrounding the victim "trying to do an assessment on him[.]" She stated that she could not approach the victim's bed because of the large number of medical personnel around him. Petitioner recalled the victim being flown to Vanderbilt while she rode with a detective to the police station.

Petitioner gave two statements concerning the victim's death, one to police and one to the prosecutor, and stated that the two statements were substantially similar though written three years apart. She recalled that, during trial, she was "chastised for writing a long statement to the police" but stated that she was trying to be "as thorough as [she] could." She said that she wanted her statement to help the police and "to show them that [she] wasn't there. Show them that [her] son was okay, that [she] did not have any part in this."

After she was released from the police station, Petitioner's neighbor drove her to Vanderbilt. When she arrived, the social worker, Ms. Parker, stopped her to speak with her. She said she was "panic-stricken" and "shocked" and that all she wanted was to see her son. However, Ms. Parker asked her a number of detailed questions before allowing her to see the victim.

Petitioner did not recall meeting with Co-Defendant's first trial counsel, Debra Lindsey, but agreed that, if she came across as "flat and uncaring and snide," that was not her intention. She understood why people might have viewed her that way because she "was just in so much shock. . . . I was just trying to figure things out."

Petitioner recalled one incident in Oregon after the wedding when Co-Defendant was trying to potty-train the victim. Co-Defendant spanked the victim "hard," so they had a conversation. She stated that she did not see "anything that showed he didn't want

to be a father." Petitioner explained, "I mean, he was struggling, at times. But it wasn't just flat out he didn't want to be a father. Just there were times that he struggled is how I viewed it. He was struggling to figure out how to be a father." She did not have any concerns that Co-Defendant would "do anything like this to" the victim else she would not "have let [Co-Defendant] near either one of us."

On cross-examination, Petitioner agreed that she returned to Co-Defendant after the Oregon spanking incident and explained that Co-Defendant "said it would never happen again." Petitioner stated that it did happen again after they moved to Tennessee. She agreed that, if she had asked for help to get away from Co-Defendant, Ms. Holley would have "tried to find a way" to help. Petitioner stated that, had she known that Co-Defendant was having anger issues at work, she would have sought help to "get someone involved." She said it shocked her to learn that Co-Defendant was discharged from the Army for "serious criminal activity."

The State read a portion of Petitioner's MTMHI medical records: "[Petitioner] didn't tell her or anyone she wanted to bleed to death. She didn't cut deep. She didn't need stitches. She said she cut her wrist to take away her pain and relieve her emotions, but not to kill herself. It was not a suicide attempt." Petitioner denied that this "sound[ed] like it may have been a fake suicide attempt[.]"

Petitioner said that she had concern for Co-Defendant "[i]n the very beginning" because she "didn't know what happened." She said, "All I kn[e]w is I had lost my son, and now [Co-Defendant] was in jail." She agreed that, at first, she was in denial that she had "married a bum." Petitioner said that her statement to trial counsel was the same as her statement at the post-conviction hearing.

James Simmons testified that he had been a practicing attorney since 1982 with a ninety-five percent criminal law practice. He stated that he was certified under Rule 13 "as capable and qualified to handle capital cases," which required specialized training every two years and being lead counsel in capital cases. Mr. Simmons said that he regularly testified regarding the American Bar Association ("ABA") standards and the performance of counsel "to give an opinion as to whether the trial counsel's performance was in compliance with the ABA standards, which are our guidance, to the level of performance which is expected of criminal defense counsel." The trial court qualified Mr. Simmons as an expert on performance of criminal defense representation.

Mr. Simmons reviewed the trial transcripts, pretrial motions, medical records and reports, army records, photographs, psychological reports, and the ABA standards. He noted that trial counsel told the trial court that he filed a pretrial motion to sever "at the insistence of his client," which indicated to the trial court that trial counsel "didn't

believe the motion had any merit," and that trial counsel failed to present any proof to support his motion and failed to renew the motion later after evidence was presented. Mr. Simmons said that trial counsel's choice to file a motion to sever just two weeks after an indictment showed that it was filed prior to any research or investigation. He said that the brevity of the motion was "an indication that [trial] counsel didn't have any confidence that the motion had merit. It cited no facts other than a conclusion of spillover, which is not prejudice, necessarily, and cited no case law." Mr. Simmons normally expected a motion to sever in a homicide case to cite to case law and have a memorandum in support of the motion stating facts. He also expected trial counsel to present witnesses in support of a motion to sever. Mr. Simmons noted that the motion to sever was filed more than a year before the hearing on the motion and yet, trial counsel had not investigated the case or presented any facts or law to support his motion during that time. He said that trial counsel "absolutely" should have renewed the motion to sever following the opening statement by Co-Defendant's counsel showing "that, in fact, the conduct and comments and emotional state of [Petitioner] was going to be equated to guilt. And that created absolute prejudice" for Petitioner's "ability [] to receive a fair trial in a joint setting." He said that, in this court's opinion on direct appeal, the panel "clearly indicated" that "one of the main issues in the case was [Petitioner's] lack of emotion" as evidence of her guilt.

Moreover, the introduction of the redacted statement from Co-Defendant -- that no one else was present and that Co-Defendant did not hurt the victim -- created "the only inference that it was [Petitioner] who did it. And [s]he had no ability at that point to cross-examine . . . the statement." Mr. Simmons stated that these facts "absolutely" created a *Bruton* issue.

Mr. Simmons testified that he could not perceive any strategical reason trial counsel did not pursue the severance motion in this case. Mr. Simmons stated that, had trial counsel investigated properly, trial counsel would have seen the crime scene photographs showed Co-Defendant's prescription bottles for medicines treating "psychopathic-type conditions." These bottles "would have led to the duty to investigate the facts of the case and any conditions [Co-Defendant] had" showing his "inability to control his emotions or actions." He said that "those medical bottles in the photographs of the crime scene, which were produced in discovery, should have been a huge red flag to further investigate this situation." Mr. Simmons asserted that a proper investigation of these medications should have led trial counsel to obtain Co-Defendant's army records, which an expert could have analyzed. Thus, further pretrial motions were warranted but "would have been predicated under a proper investigation."

Mr. Simmons noted that in Co-Defendant's military records was a transcription of Detective Alan Charvis's sworn testimony from Co-Defendant's separation hearing when

he was discharged from the Army. Mr. Simmons read Detective Charvis's prior sworn testimony. This prior sworn testimony included:

> [Co-Defendant] had access to the child all morning. [Petitioner] had left the house at approximately 10[:]00 to go shopping. She said she returned home around 12[:]30. The call came in to us around 12[:]45.
>
> . . . .
>
> [Co-Defendant] admittedly was the only one who had access to the child at the time the injuries could have occurred. [Petitioner] said the child was fine when she left the house. There were some indications of some old injuries and past abuse that was not reported. We looked at [Petitioner] as a suspect also. We could not pinpoint [Petitioner] as a suspect.
>
> Based on the time frame of the incident there would not be enough time for [Petitioner] to leave the house to go to Fort Campbell, get home, abuse the child, and then call 911. We looked at the amount of bruising and the amount of injuries that were done to the child. We also went off of the information [Co-Defendant] told us.
>
> . . . .
>
> [Co-Defendant] said that the child was okay when [Petitioner] left the house. [Co-Defendant] was the only person in the house during that time period.
>
> . . . .
>
> I contacted Grants Pass, Oregon and they had no reports on child abuse. I have witnesses that saw the child when they moved into the apartment. The witnesses said the child had bruising on the face and he ran into a truck door or something.

Mr. Simmons stated that this testimony would have been useful for trial counsel to cross-examine Detective Charvis at trial and "certainly could have" created reasonable doubt as to Petitioner's guilt. Mr. Simmons said, "I think any competent lawyer would have used a prior sworn statement of the lead detective at trial if it was beneficial in cross-examination." He stated that, based on trial counsel's failures to investigate, the cross-examination of Detective Charvis at trial "was clearly ineffective."

Other information was also found in the military records.  Mr. Simmons testified that Co-Defendant's "suicidal and homicidal ideations" listed in the records "would clearly indicate there are mental health issues regarding his stability, anger management issues, PTSD issues . . . that needed to be further investigated and followed up on."

Mr. Simmons reviewed Petitioner's medical records from MTMHI.  He said that criminal defense attorneys "pay attention" to mental health issues in a case because these issues "directly affect behavior and they're present in almost all cases, especially in homicide cases."  Mr. Simmons stated that investigating mental health issues was beneficial both for trial and for pretrial negotiations.  In this case, Mr. Simmons noted that Petitioner's medical records "could have been a way to explain her emotional state, her affect, [and] her reaction" to contradict the assertion that these things were not "consistent with a grieving mother."  Mr. Simmons disagreed with trial counsel that Petitioner's mental health issues were not relevant:

> I think it is absolutely relevant because apparently the theory of [Co-Defendant] was that because of [Petitioner]'s lack of emotional reaction, the inappropriate comments she supposedly made, and some inappropriate conduct -- for example, she was using the -- texting when she was being interviewed by a social worker -- all of that should have been investigated prior to trial.
>
> . . . .
>
> Yes, it should have been used -- and could have been used to negate what was their strongest argument as to guilt.  Which was what Judge Wedemeyer said, which was the lack of emotion equals guilt was their theory.

Mr. Simmons agreed that Petitioner's records from MTMHI showed that she was involuntarily committed for depression and an attempted suicide following the death of her son.  In the discharge notes, Mr. Simmons noted that the doctors found that "she cut her wrist to take away her pain and relieve her emotions, but not to kill herself."  Mr. Simmons said that, if he had received these documents as a defense attorney, he would have deduced that "there are clearly mental health issues associated with a traumatic event that needed further investigation[,]" including Petitioner's subsequent therapy or grief counselors upon her return to Oregon.  Based upon Petitioner's mental health records, Mr. Simmons stated that trial counsel should have filed a motion in limine to exclude testimony regarding Petitioner's demeanor because trial counsel should have "determined that it meant nothing as in guilt or innocence.  It's just her way of reacting to this event."  Mr. Simmons stated that trial counsel also should have called Ms. Converse

to testify regarding her experience as a nurse dealing with parents whose children had died.

Mr. Simmons recalled trial counsel testifying that Ms. Phillips's defense theory was "out of the blue" and said, "[I]n the absence of doing a thorough investigation, [trial counsel] very well could have been surprised. But the evidence was there to be looked at. It was waiting to be found, either by interview or by documentation." He stated, "[E]ven if the theory is ['she] w[as]n't there; [she's] got an alibi -- or whatever -- that does not relieve the obligation to investigate the case and review of the documents."

Mr. Simmons noted that the photographs showed a high chair with partially eaten food, which corroborated Petitioner's statement that she left after feeding the victim. He explained:

> I think if you take that evidence, and you compare that with the testimony and the evidence of the pathologist, who testified that these injuries -- the severity of these injuries would have been manifested immediately, then I think it would have been impossible for these injuries to have occurred prior to her leaving and that the child still be eating. That's just not reconcilable when these injuries occurred and then having breakfast.

Mr. Simmons stated that trial counsel should have filed a motion in limine to exclude the photographs of the victim and to dismiss the rape charge. He said, "I'd reasonably expect [trial counsel] to file any pretrial motion to exclude harmful evidence."

Mr. Simmons recalled Dr. Phillips testifying for the State at trial, saying that Petitioner "was a good mother, that she was very caring about her child that she -- she kept all the appointments, that she called frequently when there [were] any issues." He stated that Dr. Phillips had "absolutely . . . no indication of any type of abuse." Mr. Simmons stated that trial counsel should have interviewed Dr. Phillips prior to trial and cross-examined Dr. Phillips at trial. Mr. Simmons counted ten State witnesses that trial counsel did not cross-examine, which indicated that trial counsel "had not interviewed the witness[es] or he did not review the records."

Mr. Simmons agreed that trial counsel said in his opening statement that Petitioner loved the victim and that trial counsel admitted at the post-conviction hearing that trial counsel introduced no evidence regarding Petitioner's love for her child. Mr. Simmons stated that a defense attorney must be "careful" what he promises in an opening statement because "[i]f you promise it, you better follow through with it[,]" else an attorney will

"lose credibility with the jury." Mr. Simmons explained that he would have called the numerous witnesses that came forward to testify as to how she treated her child:

[I]t was all relevant to present a theory of defense. The right to present a defense was that -- I think the testimony today was she'd only been in Tennessee some four weeks, that she was a loving mother, and that there was no abuse.

In fact, today there's indications that she was -- very much loved the child and would have been substantive proof that she did not inflict the injuries.

And also I think it would have been -- some of the proof today would have gone to rebut the inference that her lack of affect was an indication of guilt.

Debra Ann Wall Lindsey testified that she had been a practicing criminal law attorney for thirty-five years. She testified that she represented Co-Defendant prior to Ms. Phillips. Petitioner told Ms. Lindsey that she was in the home on the day of the murder and never told Ms. Lindsey that Co-Defendant had abused the victim. She said, "I remember that she was concerned that she had some evidence that the police had overlooked that she thought would exonerate her husband. And she brought it to my office." Ms. Lindsey withdrew from representing Co-Defendant just before trial. Ms. Lindsey stated that Petitioner never told her anything contradictory from or in more detail than the statement she gave police. Ms. Lindsey said that, the first few times they spoke about the case, Petitioner referred to the victim as "that child" rather than using his name. Ms. Lindsey testified that she was also a registered nurse who worked with abused children for ten years, so that language raised "red flags" for her.

On cross-examination, Ms. Lindsey explained that she represented Co-Defendant for several years. She said that she filed several pretrial motions, which she usually did in murder cases. Ms. Lindsey explained that she filed a pretrial motion to exclude photographs of the victim because "they were very inflammatory, and a lot of them were duplicative." She agreed that she filed that motion to exclude to have a fair trial for her client. She recalled filing a motion in limine to exclude Petitioner's testimony that Co-Defendant was "a sexual deviant." Ms. Lindsey said that she filed that motion based upon conversations with Petitioner's trial counsel.

Ms. Lindsey agreed that she investigated the case and secured two expert witnesses for Co-Defendant. Ms. Lindsey explained that she withdrew from representing Co-Defendant because she learned that the State's medical witness from Vanderbilt "was

- 39 -

going to change his testimony regarding the timing of that injury" and that the timing was "very critical" in this case. She explained:

> There was a physician that we had spoken to. And it was one that [the prosecutor] and I were present for the conversation. And as an RN, when a doctor speaks, I listen. I was an RN in the '70s before we had computers. I take notes down. I know what doctors say. [The doctor] had given us an opinion regarding the time that he believed the child was injured. I don't remember what it is now, but I just remember that I had taken detailed notes. I was notified at some point that he was going to change that prior to trial. And then the only person to impeach him was [the prosecutor] or myself. [This] created the conflict there because I felt like I would need to be a witness.

Ms. Lindsey did not recall trial counsel ever asking her about what the physician had told her and never called Ms. Lindsey as a witness. She stated that she spoke to "about ten" of the doctors and some nurses at Vanderbilt. She agreed that it was important for her to speak with "[e]veryone that [she] could." Ms. Lindsey met with Co-Defendant about once per month. She said that, during these visits, she became concerned about Co-Defendant's mental health and that she would "always" explore mental health in a case like this. Ms. Lindsey stated that she met with Petitioner several times and had in-depth interviews with her. She agreed that, for first-degree murder cases of children, which are "the worst of the worst[,]" the steps she took were the "standard for professionalism in criminal defense practice." The following exchange occurred:

> Q. You certainly would not abandon investigating potential witnesses in a case like this, would you?
>
> A. No, sir.
>
> Q. You certainly would not meet with your client only one time, would you?
>
> A. No, sir.
>
> Q. You certainly wouldn't abandon filing pretrial motions?
>
> A. No, sir.

Q. You certainly wouldn't abandon a severance motion if you thought it was a good one in a case like this?

A. No, sir, I would not.

On redirect examination, Ms. Lindsey explained that she did not know if Co-Defendant's trial counsel used the expert witnesses she had secured. She said that Co-Defendant was evaluated and found competent to go to trial. She agreed that, at the conclusion of proof, she would abandon a motion to sever if she felt like it was not sustainable. Ms. Lindsey stated that she "traced down every piece of medical proof [she] could get." She felt that a lot of the medical proof was contradictory: "You have different layer, different departments. You have your interns, your residents, your attendings. Everybody has a different opinion. A lot of it was conflicting." She agreed that there were fewer discrepancies among the attending physicians, who had "the final call" on a case. Ms. Lindsey stated that trial counsel was not involved "in any way, shape, or form" at the time she was investigating at Vanderbilt.

Robert Joseph Nash testified that he was the assistant district attorney general who prosecuted Petitioner at trial. He stated that, in the two years and eight months between the time Co-Defendant was indicted and the time Petitioner was indicted, other assistant district attorneys who "knew the facts of the case questioned [him] regarding the status of [Petitioner]." He explained,

I just want to say, [it was] not only those individuals in the office, as far as district attorneys. But as I started to interview witnesses, those at the apartment complex, those at the medical facility -- I guess Gateway -- the nurses and the doctors, other people from Vanderbilt that treated [the victim] -- I mean, they all asked me ["]what about the mother,["] was pretty much the consensus.

General Nash stated that, when Detective Charvis testified at Co-Defendant's military separation hearing, "he hadn't talked to a doctor other than over the phone. . . . He had no records. I had retrieved them." General Nash said that he briefly spoke with Petitioner before she returned to Oregon. Later, he traveled to Oregon because Petitioner was pregnant and could not travel. When General Nash was in Oregon, he spoke with Dr. Phillips and Petitioner, as well as others in the community.

When General Nash interviewed Petitioner in Oregon, he "thought she was a witness. She was the mother of [the victim]. She was not taken to the grand jury. She was not arrested." General Nash testified that the statement Petitioner gave him during the interview in Oregon was not substantially different from her testimony at the post-

conviction hearing. He said it was "somewhat interesting" that both Co-Defendant and Petitioner spanked the victim on the morning of his death but that the only abuse mentioned while General Nash was in Oregon was the "incident that happened in Oregon" before they came to Tennessee. General Nash said that Petitioner was "very reserved" and "wasn't very forthcoming." Petitioner's mother told General Nash, "Don't worry. She's just afraid. . . . She's afraid of being arrested" because Detective Charvis said he "ought to arrest [her], too." General Nash said that, during his trip to Oregon, he did not learn anything from Petitioner that he did not already know.

Then General Nash met with Dr. Phillips and went over the medical records. He said that he brought Dr. Phillips to testify at trial "[b]ecause he had to give the whole story. I wanted to show how [the victim] was being treated and looked after prior to coming here." General Nash said that the medical proof was "irrefutable" and that it showed that the victim was beaten to death. General Nash testified that Dr. Wushensky said the brain would take "six to eight hours" to get as swollen as it did by the time of the brain scan. General Nash stated that he believed that put the timing of the injury at 8:00 or 9:00 that morning.

General Nash stated that trial counsel attempted "many times" to enter into plea negotiations and that he "was persistent[.]" He said that he had "conversations with [Petitioner]" and that she would "not admit that [Co-Defendant] was causing any injuries" to the victim. He said, "So the medical proof dictated to me there was something else that I'm missing. There's only two people I can get that from. And one was supposed to be the mother of the child who was beaten." General Nash did not believe that the statements the defendants provided were credible because they did not provide for the damage done to the victim prior to the fatal injuries. General Nash stated that he explained the medical records to trial counsel and that what he showed trial counsel was the evidence presented at trial. General Nash noted that trial counsel admitted evidence from the Vanderbilt medical records that Petitioner was "grieving appropriately."

General Nash testified that trial counsel provided him with a recording of a "hypnosis session" Petitioner went through. He stated that it was not admissible in court. He said that he had known Petitioner for three years prior to her becoming a defendant in this case and that Petitioner had never told him of her suicide attempt or mental health issues. General Nash said that, even if he had known of Petitioner's mental health issues, none of it would have affected his plea negotiations with trial counsel.

Regarding Co-Defendant's statement to police, General Nash stated that the parts referring to Petitioner were redacted. He said,

- 42 -

[A]nother thing you've got to remember about the statements. Initially people were under the impression, initially, that this happened during the grocery store incident. [Dr.] Wushensky[']s testimony now brought the time frame before she ever went, period. Which has been -- not been refuted today. So . . . they were both there early in the morning, by their own statements. All the rest of it was made up.

On cross-examination, General Nash agreed that Dr. Abramo testified as to some "small scattered bruises noted in different phases of healing"[2] on the victim but did not recall if any other medical personnel testified to "old bruising." General Nash agreed that the autopsy was performed four days after the victim's death and that Detective Charvis testified before the military tribunal fourteen months later. General Nash agreed that, if he had had the transcript of the military proceeding, he would have considered it important to turn over during discovery.

The State asked General Nash about Ms. Lindsey's testimony that she withdrew as Co-Defendant's counsel because Dr. Wushensky changed his medical opinion. However, General Nash stated that Dr. Wushensky denied changing his opinion.

During a deposition, Catherine Zern testified that she had a Master's degree in social work and had been a licensed clinical social worker in Oregon since 1996. She said that Petitioner was her patient in 2009, after the victim's death when Petitioner returned to Oregon. Ms. Zern noted that Petitioner was

triggered psychologically and physically by seeing men and children, having intrusive thoughts, nightmares, a sense of foreshortened future, detachment and numbing, being unable at times to cry, as well as hyper-arousal exhibited in early morning awakenings, decreased appetite, exaggerated startle response, intense anger, particularly at herself, extreme -- and extreme difficulty concentrating. Her mood was depressed, and numbing would alternate with crying. [I]t wasn't clear if she was having panic attacks. She was having episodes that suggested panic attacks.

[S]he was on Trazadone and Celexa, and so I would have wanted her followed up with a psychiatri[st] and medications.

---

[2] At trial, Dr. Abramo stated, "[T]here were multiple old bruises of varying degrees. It's hard to gauge now at actually when those bruises truly occurred but, to me, in my medical opinion they look like they were greater than a day."

Ms. Zern explained that "hyper-arousal" manifested in difficulty sleeping, agitation, anxiety, and "fight-flight-freeze." She stated that Petitioner was "exhibiting complicated bereavement" which was "in the context of a traumatic event." Ms. Zern found that Petitioner had PTSD "related to the death of her son." Petitioner scored on the "high end of moderate" for anxiety and on the "high end of severe" for depression. Ms. Zern concluded that Petitioner had "some suicidal ideation."

Because of her "presenting symptoms," which were "interfering with her functioning," Ms. Zern sent Petitioner to see a psychiatrist, Dr. Kathleen Hughes-Kuda. Dr. Hughes-Kuda diagnosed Petitioner with severe PTSD and dependent personality disorder. Ms. Zern stated that Dr. Hughes-Kuda's report expressed perceptions that were "in line" with her own. Dr. Hughes-Kuda had recommended follow-up treatment with Ms. Zern as well as prescribing medication for Petitioner. Ms. Zern treated Petitioner for twenty-eight months, and Ms. Zern's observations over that time supported Dr. Hughes-Kuda's initial assessments.

Ms. Zern reviewed the records from MTMHI and noted that Petitioner was rated as suicidal upon admission. She also noted that Petitioner's discharge paperwork stated that "she had no intentions of killing herself." In explaining this discrepancy, Ms. Zern stated:

> Well, it's possible that she felt better. I mean, there are a number of possibilities. One would be that oftentimes, people say I'm not -- I'm okay now, let me go, I want to get out of here. So, you know, so they will tend to minimize either their current suicidality or what they were admitted for. It's also possible that she had -- that she was feeling better, you know, she was less suicidal when she left.

Ms. Zern testified that Petitioner was not given to threatening suicide "to gain attention," and that she "did have some suicidality, but in treatment, she was able to manage that with supportive treatment."

Ms. Zern stated that Petitioner was not very good at explaining a story because she was traumatized and experiences the memory in "images." She explained,

> [T]raumatic memory is stored often implicitly, and it's stored different than other memories, and so it tends to come out when it's triggered by something rather than being able to sort of organize the story with a beginning, middle, and end, and that's part of what treatment is designed to do, is help people . . . manage.

Ms. Zern explained that Petitioner appeared to have a "flat affect" because she went into "hypo-arousal, where she would sort of numb out, or she would . . . dissociate. And so when she was numb, she often looked flat. . . . And when [Petitioner] would become, like, over-anxious, she would just kind of shut down into that flat place." Ms. Zern said that, in her work with trauma survivors "who are in an acute phase, there's a bit of unreality and shock, and you can . . . hardly tell that anything has happened." She stated that she observed this dissociative state several times over the course of Petitioner's twenty-eight months of treatment.

Petitioner had another child while she was in therapy with Ms. Zern, but Ms. Zern had no concerns about that child's safety with Petitioner. Ms. Zern left her place of employment, so she referred Petitioner to Barbara Jones, a licensed marriage and family therapist. Ms. Zern said that Ms. Jones "had done a lot of work with trauma and domestic violence," and Ms. Zern also concluded that Petitioner suffered from PTSD.

Ms. Zern stated that she spoke with General Nash over the phone in August of 2011 and shared her observations of Petitioner. She said that she and Ms. Jones were both surprised that they never received a call from trial counsel. Ms. Zern stated that she would have been willing and available to testify at trial had she been called.

On cross-examination, Ms. Zern stated that she was not testifying as to Petitioner's mental state at the time of the crime or whether she was competent to stand trial. She said that Petitioner was not "insane" when they met. She said that Petitioner's memory of the day the victim died was in "a lot of different pieces" and that she did not know "that the pieces were put together." Ms. Zern explained that Petitioner "didn't really have a complete narrative of the day" when she was in therapy but stated that she "didn't ask her for one either." Ms. Zern testified that it was her "professional opinion" that Petitioner had been the victim of domestic violence of Co-Defendant. She said that her conclusion of domestic violence was "based on [Petitioner's] presentation, her symptoms. . . . Her presentation and . . . the way her -- the information came out was congruent with what she was reporting." Ms. Zern agreed that Petitioner did not disclose beatings, threats of beatings, or confining her against her will. She explained, "[O]ften in domestic violence, you see people threatening to kill themselves as a way of manipulating their partner, and that kind of behavior I would categorize as terrorizing." Ms. Zern stated that she could not conclude for certainty what caused the PTSD and dissociative states because she was not present during the commission of the offenses.

On redirect examination, Ms. Zern stated that Petitioner never told her that Petitioner observed Co-Defendant beating the victim and inflicting the fatal injuries. She said that Petitioner's memory from the weeks leading up to the victim's death, as well as the day he died, were "fragmented." She stated that she told General Nash that

Petitioner's memories were "fragmented" and that it was an "involuntary process." Ms. Zern said, "[I]t's art and science to be able to get a coherent narrative from a trauma survivor."

*Order Denying Post-Conviction Relief*

The post-conviction court denied the Petition in a written order.[3] Regarding Petitioner's claim that trial counsel was deficient for abandoning the motion to sever, the court stated that trial counsel cannot be deficient "simply based on [the] failure to seek a severance of defendants." Citing *State v. Harbison*, 539 S.W.3d 149, 161 (Tenn. 2018), it stated that "[h]ostility between defendants, attempt to cast blame on each other, finger-pointing, and tattling do not necessarily require a severance."

Regarding trial counsel's failure to investigate Co-Defendant's military records, the post-conviction court stated that the military records indicated that Co-Defendant was discharged because of the charges in the instant case. Therefore, it concluded, "Assuming for the sake of argument that trial counsel should have obtained a copy of [C]o-[D]efendant's service record[,] there has not been sufficient proof that the absence of such records served to prejudiced the defense of the Petitioner, as required by the second prong of *Strickland*."

The post-conviction court stated that the evidence at the post-conviction hearing did not support the contention that trial counsel was deficient for failing to investigate Petitioner's unemotional state. The court said,

> Testimony of Petitioner's conduct in providing care for her child while living in Oregon, prior to her moving to Tennessee and prior to her marriage to [C]o-defendant . . . seems unlikely to be relevant to the issue of her appearing to display sufficient emotion. There was no evidence that the Petitioner informed counsel of an emotional or psychological condition which would have given rise to the appearance of lacking emotion.

Moreover, the post-conviction court stated that "[t]he reasonableness of the actions of an attorney may be determined or substantially influenced by the client's own statements or actions and what investigation decisions are reasonable depend on such information obtained from the client[,]" citing *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014).

---

[3] Because the post-conviction court addressed several issues in its order that Petitioner did not raise on appeal, we will limit our discussion to the issues raised on appeal.

The post-conviction court concluded that, due to Petitioner's residence in Oregon, trial counsel was not deficient for holding "more telephonic meetings" rather than "face to face" and that trial counsel recalled meeting with Petitioner at least three times. It stated that Petitioner did not establish by clear and convincing evidence that trial counsel did not sufficiently consult with Petitioner.

The post-conviction court stated that there was no proof presented that refuted the medical proof at trial regarding the timing of the victim's death or the alleged sexual assault. Regarding Petitioner's claim that trial counsel failed to present a defense, the post-conviction court found that

> Trial counsel cross[-]examined witnesses, presented medical records from Vanderbilt Medical Center which stated, [P]etitioner was "grieving appropriately during this time evidenced by her crying, holding the [victim's] hand and writing the [victim] a good bye letter." The records also reflected [P]etitioner requested and met with the Chaplain as well.

The post-conviction court found that, removing the judgment of hindsight, trial counsel's defense strategy was reasonable. Regarding Petitioner's "flat affect," the post-conviction court stated:

> The testimony of [trial] counsel indicated that he was aware that Petitioner could be perceived as being unemotional and that this was discussed with her. Counsel introduced medical records which reflected the response of the Petitioner as "grieving appropriately." Petitioner has presented no law supporting a basis to exclude evidence of Petitioner's demeanor or argument which would support its exclusion. As to the failure to retain an expert to comment on trauma victims['] range of emotions, Petitioner has presented no admissible proof that such an opinion would be expressed as to the Petitioner. Assuming that the testimony of Catherine Zern would have been admitted for that purpose[,] there has been no showing that the absence of such testimony establishes a prejudice to the defense of the Petitioner, so as to meet the second prong of *Strickland*.

This court granted Petitioner's motion to late-file a notice of appeal.

## Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and

fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. *Id.* (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015).

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." *Fields*, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Id.* (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457.

*I. Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). "[T]his court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of defense options." *Jeffrey Whitaker v. State*, No. E2001-02399-CCA-R3-PC, 2003 WL 21276125, at *3 (Tenn. Crim. App. June 3, 2003) (citing *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

## A. Pretrial Motions

"[E]ffective representation includes a duty for attorneys to 'be prepared, where appropriate' to make pre-trial motions." *Brian Christopher Dunn v. State*, No. M2017-00271-CCA-R3-PC, 2017 WL 5565632, at *8 (Tenn. Crim. App. Nov. 20, 2017) (quoting *Johnson v. United States*, 604 F.3d 1016, 1019 (7th Cir. 2010)), *perm. app. denied* (Tenn. Feb. 14, 2018). To prove prejudice based on trial counsel's failure to file a pretrial motion, a petitioner must show that (1) the pretrial motion would have been granted, and (2) that there was a reasonable probability that the outcome of the proceeding would have been different had trial counsel filed the motion. *See Brian Cameron Frelix v. State*, No. M2019-01070-CCA-R3-PC, 2020 WL 5888144, at *10 (Tenn. Crim. App. Oct. 5, 2020) (citing *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006), *abrogated on other grounds by Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018)), *perm. app. filed* (Tenn. Dec. 4, 2020); *Joshua Iceman v. State*, No. M2018-02202-CCA-R3-PC, 2020 WL 58312, at *5 (Tenn. Crim. App. Jan. 6, 2020); *Larry Mitchell v. State*, No. W2004-00981-CCA-R3-PC, 2005 WL 957092, at *2 (Tenn. Crim. App. Apr. 25, 2005), *perm. app. denied* (Tenn. Aug. 22, 2005).

### 1. Motion to Sever

Petitioner argues that Co-Defendant's statement to police that he did not inflict the victim's fatal injuries inevitably pointed to Petitioner as the one responsible. Petitioner claims that trial counsel "failed to understand the legal principles governing *Bruton* [*v. United States*, 391 U.S. 123 (1968)], and thus failed to assert the motion to sever based

on *Bruton*. She also contends that trial counsel was deficient for failing to renew the motion to sever based on antagonistic defenses after hearing Co-Defendant's counsel's opening statement argument that Petitioner's "flat affect" was evidence of her guilt. Petitioner argues, "The nature of the antagonism was such as to make [Co-Defendant] the accuser of [Petitioner], so she had to defend not only against the State's evidence and arguments, but also against the evidence and arguments offered by [Co-Defendant]."

The State responds that Petitioner cannot show that trial counsel was deficient in abandoning the motion to sever because there was neither a *Bruton* issue nor such antagonistic defenses that severance was required. The State argues that *Bruton* does not apply because Co-Defendant's statement to police did not directly implicate Petitioner. Moreover, the State contends that Petitioner failed to show prejudice because the trial court would have denied the motion to sever.

Tennessee Rule of Criminal Procedure 8(c)(1) provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each of the defendants is charged with accountability for each offense included[.]" Tenn. R. Crim. P. 8(c)(1). "While 'mutually antagonistic' defenses may mandate severance in some circumstances, they are not prejudicial per se." *State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) (quoting *State v. Russell David Farmer, et al.,* No. 03C01-9206-CR-00196, 1993 WL 247907 (Tenn. Crim. App. July 8, 1993)). "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." *Russell David Farmer, et al.*, 1993 WL 247907, at *4 (quoting *United States v. Horton,* 705 F.2d 1414, 1417 (5th Cir. 1983)).

In *State v. Harbison*, our supreme court noted that:

[t]here is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant. *See United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987).

539 S.W.3d 149, 159 (Tenn. 2018).

Here, Petitioner argues that, because Co-Defendant's counsel sought to "cast blame" on Petitioner for the victim's murder and because Co-Defendant's statement to police was admitted, severance was necessary for a fair trial. She contends that Co-Defendant's statement violated her rights under *Bruton* and that trial counsel was ineffective for failing to seek the motion to sever. Thus, the question before us is whether Petitioner has shown by clear and convincing evidence (1) that a motion to sever would have resulted in severance, and, if so, (2) that there is a reasonable probability that the result of the proceedings would have been different had the defendants been severed. *See Larry Mitchell*, 2005 WL 957092, at *2.

In *Bruton v. United States*, 391 U.S. 123, 136-137 (1968), the United States Supreme Court held that, "where two defendants are jointly tried, admission of one defendant's pre-trial statement implicating the co-defendant violates the co-defendant's Sixth Amendment right to confront and cross-examine witnesses against him." *State v. Jack Price*, No. E2011-01050-CCA-R3-CD, 2013 WL 5371679, at *13 (Tenn. Crim. App. Sept. 26, 2013) (citing *Bruton v. United States*, 391 U.S. 123, 136-137 (1968)). The Tennessee Supreme Court has applied this holding to Tennessee case law. In *State v. Elliott*, the supreme court stated, "[W]here[] the confession of one non-testifying codefendant contradicts, repudiates, or adds to material statements in the confession of the other non-testifying codefendant, so as to expose the latter to an increased risk of conviction or to an increase in the degree of the offense with correspondingly greater punishment, the latter codefendant is entitled to test the veracity of the statements in the confession of his codefendant." 524 S.W.2d 473, 478 (Tenn. 1975). Further, this court adopted the extension of *Bruton* from the Sixth Circuit Court of Appeals, "holding that the prohibition applies not only to a non-testifying codefendant's *confessions*, but also to *statements* made by the codefendant that implicate the defendant." *State v. Ruby Breeden*, No. E2004-01512-CCA-R3-CD, 2005 WL 3199280, at *8 (Tenn. Crim. App. Nov. 30, 2005) (quoting *Pettyjohn v. Newberry,* 225 F.3d 659 (6th Cir. 2000)) (emphasis in original).

"Tennessee Rule of Criminal Procedure 14(c)(1) addresses a *Bruton* problem." *State v. Edward Coleman*, No. W2001-01021-CCA-R3-CD, 2002 WL 31625009, at *7 (Tenn. Crim. App. Nov. 7, 2002), *perm. app. denied* (Tenn. Mar. 10, 2003). Rule 14(c)(1) states:

> If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the [S]tate intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:

(A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;

(B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or

(C) severance of the moving defendant.

Tenn. R. Crim. P. 14(c)(1). This court has stated:

Tennessee Rule of Criminal Procedure 14(c)(1) provides a specific procedure when severance is sought on the basis of "an out-of-court statement of a codefendant [which] makes reference to the defendant but is not admissible against the defendant." According to the Advisory Commission Comments, this provision specifically addresses "the *Bruton* issue . . . making severance unnecessary where no *Bruton* violation would follow, as would be true, for example, where the confessing codefendant testifies or where redaction eliminates any prejudice to the nonconfessing codefendant." Tenn. R. Crim. P. 14, Advisory Comm'n Cmt. (citing *Bruton*, 391 U.S. 123).

*Joletta Summers v. State*, No. W2016-02157-CCA-R3-PC, 2017 WL 2998787, at *9 (Tenn. Crim. App. July 14, 2017), *perm. app. denied* (Tenn. Dec. 11, 2017). The "rule in *Bruton* does not apply to confessions . . . from which 'all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant.'" *Dorsey v. State,* 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978) (quoting *ABA Standards Relating to Joinder and Severance* § 2.3(a)(ii) (1967)).

On direct appeal, Petitioner argued that the trial court erred in not granting her motion to sever. *Joshua Starner*, 2016 WL 1620778, at *21. Because Petitioner had "abandoned" the motion at trial and failed to raise it in her motion for new trial, this court reviewed the issue under plain error. *Id*. The court concluded:

The evidence presented at trial did include statements by each Defendant. Those statements, however, did not implicate each other, and neither Defendant testified against the other. Both Defendants agreed that the victim was not in the care or control of anyone other than the two of them. Both Defendants indicated that the victim had suffered a fall from a Jeep while "mudding." Both Defendants indicated that the victim was acting

normally the day of the killing. Neither Defendant offered any explanation for the victim's injuries other than the bare allegation that they had not caused the injuries and so the other Defendant must have, by implication, caused them. [Co-Defendant]'s statement included one sentence saying that [Petitioner] also "spanked" the victim, but the trial court redacted that sentence from his statement, and it was never heard by the jury. . . . There is no indication that a severance was "necessary to achieve a fair determination of the guilt or innocence of" the Defendants. Tenn. R. Crim. P. 14(c)(2)(ii) (2000). Further, there is no evidence that a severance was required pursuant to Tennessee Rules of Criminal Procedure 14(c)(1), permitting severance of co-defendants where a *Bruton* violation would follow.

*Id*.

We agree. The State admitted Co-Defendant's redacted statement to police to prove that he was present at the time of the victim's fatal injuries, and his redacted statement as presented to the jury did not directly refer to Petitioner. Neither co-defendant admitted to witnessing the other co-defendant inflict the fatal injuries on the victim. While it is true that Co-Defendant's counsel sought to blame Petitioner for the murder, arguments of counsel are not evidence and are not relevant in determining whether a *Bruton* violation has occurred. *See United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989) ("*Bruton* is directed toward preserving a defendant's right to cross-examination, and thus has nothing to do with arguments of counsel based on their interpretation of the evidence."). Thus, no *Bruton* issue required severance.

Moreover, the co-defendants' defenses were not antagonistic to the degree requiring severance in order to fairly determine the guilt or innocence of the co-defendants. *See e.g., State v. Erica D. Goodner*, No. E2007-01048-CCA-R3-CD, 2009 WL 605141, at *43 (Tenn. Crim. App. Mar. 10, 2009) (finding no reversible error where only two co-defendants were present at the time of the victim's death and where both of the co-defendants' statements, while denying their own involvement, did not directly implicate the other co-defendant). There was no basis to grant a motion to sever at trial, and Petitioner presented no evidence at the post-conviction hearing that additional investigation by trial counsel would have revealed a successful basis for a motion to sever. Therefore, we cannot conclude that trial counsel was deficient for failing to renew the motion to sever, and Petitioner has not shown that a motion to sever would have been granted and thus cannot prove prejudice. Petitioner is not entitled to relief on this issue.

- 53 -

## 2. Other Pretrial Motions

Petitioner argues that trial counsel was ineffective for filing "a paltry pleading entitled Motion to Dismiss" that was two sentences in length and argued that "the State has no evidence against [Petitioner]." She contends that trial counsel was ineffective because he told the trial court that he was "making the motion at the insistence of his client" and that he conceded he had no legal grounds for the motion. Petitioner also argues that trial counsel was deficient for failing to file a motion for a bill of particulars, a motion in limine to exclude evidence of Petitioner's "flat affect," and "other pretrial motions." Petitioner concedes that she cannot demonstrate whether there was a reasonable probability that these motions would have affected the outcome; however, she argues that trial counsel was deficient for failing to file them.

Petitioner does not assert the legal basis on which trial counsel should have filed a motion to dismiss or any other pretrial motion. Accordingly, Petitioner has not shown deficient performance or prejudice and is not entitled to relief on this issue.

## B. Failure to Investigate

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) (citing *Baxter*, 523 S.W.2d at 933). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see Burns*, 6 S.W.3d at 462. However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

### 1. Co-Defendant's Military Records: Military Tribunal

Petitioner argues that trial counsel was deficient for failing to investigate Co-Defendant's military records. She contends that Co-Defendant's statements to Detective Charvis, as provided by Detective Charvis's prior sworn testimony to a military tribunal, coupled with Detective Charvis's prior sworn testimony that he could not pinpoint Petitioner as a suspect, would have created reasonable doubt as to Petitioner's guilt. Thus, she argues, trial counsel's deficient performance in failing to investigate and present these statements resulted in prejudice.

- 54 -

The State responds that trial counsel was not deficient for failing to investigate Co-Defendant's military records because Petitioner was unaware of what those records contained and because Petitioner refused to implicate Co-Defendant in the crime. The State contends that the contents of the records would not have been admissible because a "third party defense" is not available to a defendant where the third party is her co-defendant and where she could be culpable for his actions under the theory of criminal responsibility. The State argues that Petitioner cannot prove prejudice because "any evidence portraying [C]o-[D]efendant as the physical abuser would not undermine the jury's conclusion that [P]etitioner was criminally responsible for his abuse." Moreover, the State argues that, without confronting Detective Charvis with the tribunal testimony at the post-conviction hearing, Petitioner cannot prove prejudice. The State contends that, due to the evidence presented at trial, the statements were unlikely to undermine Detective Charvis's credibility.

### a. Deficient Performance

The post-conviction court did not make a finding regarding deficient performance for failing to investigate Co-Defendant's military records but relied on the prejudice prong in denying relief. Assessing trial counsel's decision not to investigate "for reasonableness in all the circumstances," and applying a "heavy measure of deference to counsel's judgments," we believe that trial counsel was deficient in his failure to investigate Co-Defendant's military records. *See Strickland*, 466 U.S. at 691.

Based on the record before us, trial counsel knew that Co-Defendant had been in the military, and Petitioner asked trial counsel if he was going to get any military records prior to trial. Moreover, Mr. Simmons testified that, had trial counsel investigated properly, the crime scene photographs released in discovery showed Co-Defendant's prescription bottles for medicines treating "psychopathic-type conditions." He stated that these bottles "were a huge red flag" and would have led a competent attorney to investigate Co-Defendant's mental health, which would have led to the military records. In addition, trial counsel also received a letter almost two years before trial, dated June 12, 2012, from Ms. Rich. This letter stated that, when Ms. Rich met Co-Defendant, "[Co-Defendant] was rude and controlling toward [Petitioner] and [the victim]. He exhibited excessive outward sexual behavior towards her, (fondling, touching inappropriately) with a group of people present. . . . My instincts told me that this was not a good man for [Petitioner] or anyone for that matter." Finally, according to Co-Defendant's Motion in Limine #4, trial counsel told Co-Defendant's counsel that Petitioner was going to testify that Co-Defendant was a "sexual deviant." Trial counsel had ample evidence that Co-Defendant had mental health issues warranting investigation.

Trial counsel offered no explanation as to why he chose not to investigate Co-Defendant's military records other than that "[his] defense was going to be that [Co-Defendant] did it." An attorney cannot "claim that failure to investigate was part of his trial strategy if the investigation itself was cursory and unreasonable." *Simmons v. Epps*, No. CIV.A 1:04CV496HSO, 2008 WL 4446615, at *26 (S.D. Miss. Sept. 26, 2008) (citing *Wiggins v. Smith,* 539 U.S. 510, 527 (2003)), *aff'd*, 654 F.3d 526 (5th Cir. 2011). Trial counsel failed to make the most basic inquiries into the only person besides his client who could be guilty of the crime even though he was handed evidence suggesting Co-Defendant had significant mental health issues. Additionally, trial counsel stated in his opening statement that his theory of defense was that Co-Defendant "beat and killed" the victim; therefore, trial counsel should have investigated sufficiently in an effort to present some sort of evidence to support that theory. *See State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); *State v. Moorman*, 358 S.E.2d 502, 511 (N.C. 1987). Further, Petitioner gave trial counsel no reason to believe that pursuing an investigation of Co-Defendant's military records "would be fruitless or even harmful." *See Strickland* 466 U.S. at 691. We conclude that trial counsel's inaction fell below professional standards in failing to investigate the military records of his client's co-defendant in a rape and murder trial. Petitioner has satisfied the *Strickland* deficiency prong on this issue.

## b. Prejudice

Relying on *State v. Black*, 794 S.W.2d 752 (Tenn. Crim. App. 1990), the State contends that Petitioner cannot establish prejudice because she did not question Detective Charvis at the post-conviction hearing regarding the contents of his prior sworn testimony. However, the State's reliance on *Black* is misplaced. *Black* holds that, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Id*. at 757. Here, Detective Charvis testified at trial, so *Black* is distinguished from the present case. *See James L. Dowell, III v. State*, No. M2016-01364-CCA-R3-PC, 2017 WL 2859010, n. 7, at *14 (Tenn. Crim. App. July 5, 2017) (considering the prejudicial effect of the likely testimony of a witness, even though that witness was not presented at the post-conviction hearing, because the witness had previously testified under oath), *perm. app. denied* (Tenn. Nov. 16, 2017).

For trial counsel's deficient performance in failing to investigate Co-Defendant's military records to be prejudicial to Petitioner, Petitioner must show that (1) the content of Co-Defendant's military records would have been admissible at trial, and (2) there was a reasonable probability that the outcome of the proceeding would have been different had those records been admitted. *See Terry Lynn King v. State*, No. 03C01-9601-CR-00024, 1997 WL 416389, at *15 (Tenn. Crim. App. July 14, 1997), *aff'd*, 989 S.W.2d

319 (Tenn. 1999) (stating that a petitioner suffered no prejudice in an ineffective assistance claim where the evidence he wanted his trial counsel to investigate was not admissible in court); *Goad*, 938 S.W.2d at 370.

"[A]n accused is entitled to present evidence implicating others in the crime." *State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003). "[T]he Rules of Evidence govern admissibility of evidence implicating someone other than the defendant." *State v. Gary Thomas Reed*, No. E2009-02238-CCA-R3-CD, 2011 WL 1842711, at *9 (Tenn. Crim. App. May 12, 2011) (citing *Powers*, 101 S.W.3d at 394-395), *perm. app. denied* (Tenn. Aug. 24, 2011). Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted therein." *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." Tenn. R. Evid. 805.

Co-Defendant's statement to Detective Charvis which Detective Charvis testified to at the military tribunal -- that "the child was okay when [Petitioner] left the house" and that "[Co-Defendant] was the only person in the house during that time period" -- constitutes hearsay within hearsay. *See id*. Co-Defendant's statement to Detective Charvis was admissible as substantive evidence as an "admission by a party opponent" because it was his own statement that could have been offered against him at trial. *See* Tenn. R. Evid. 803(1.2)(A); NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 8.06[2] at 8-54 (6th ed. 2011). Further, his statement to Detective Charvis was admissible as a "statement against interest" because Co-Defendant was unavailable at trial and because his statement directly contradicted his defense theory that Petitioner inflicted the fatal injuries, "render[ing] invalid a claim by the declarant against another." *See* Tenn. R. Evid. 804(a), (b)(3); *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (stating that the assertion of the Fifth Amendment privilege against self-incrimination renders a declarant "unavailable" for purposes of Tennessee Rule of Evidence 804); *see also State v. Charles Sanderson*, No. M2007-00387-CCA-R3-CD, 2008 WL 624922, at *8 (Tenn. Crim. App. Mar. 7, 2008) (concluding that a statement of an unavailable declarant which exculpates a declarant's co-defendant must also inculpate the declarant to be admissible under the statement against interest hearsay exception). Thus, Co-Defendant's statement to Detective Charvis was admissible as substantive evidence under two hearsay exceptions. Tenn. R. Evid. 803(1.2)(A), 804(b)(3); *United States v.*

*Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014) (stating that a statement against interest may be admitted as substantive evidence against a co-defendant).

Having concluded that Co-Defendant's statement itself was admissible, we also determine that the content of Detective Charvis's prior sworn testimony at Co-Defendant's military separation tribunal was admissible under the Rules of Evidence. Regardless of how Detective Charvis would have answered questions regarding his prior sworn testimony at trial, the content of the prior sworn testimony would have been admissible. One of three scenarios would have played out at trial: Detective Charvis would have admitted to making the prior sworn testimony, or he would have been unable to fully and accurately recall the prior sworn testimony, or he would have denied making the prior sworn testimony.

Under the first scenario, no further analysis is necessary -- the content of Co-Defendant's statement would be admissible as substantive evidence under Rules 803(1.2)(A) and 804(b)(3), as explained above, rather than hearsay within hearsay. Under the second scenario, while the transcript itself would not have been admissible, the content of the prior sworn testimony would have been admissible as substantive evidence as a past recorded recollection. *See* Tenn. R. Evid. 803(5); *State v. Davis*, 466 S.W.3d 49, 62 (Tenn. 2015) (quoting *Mitchell v. Archibald,* 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998)). Under the third scenario, the transcript of the prior sworn testimony would have been admissible as substantive evidence as a prior inconsistent statement. *See* Tenn. R. Evid. 613(b), 803(26).

Having concluded that the content of Detective Charvis's prior sworn testimony was admissible under all three scenarios, we must now determine whether the failure to investigate prejudiced Petitioner. *Goad*, 938 S.W.2d at 370. The post-conviction court made no findings of fact regarding Detective Charvis's prior sworn testimony. Co-Defendant's statement to police, which was admitted as an exhibit at trial, indicated that the victim was "as happy as ever" after Petitioner left for the commissary. We conclude that Co-Defendant's statement to police as admitted at trial was similar enough in content to Detective Charvis's prior sworn testimony that the absence of the prior sworn testimony did not prejudice Petitioner.

Finally, the absence of Detective Charvis's prior determination that he could not "pinpoint" Petitioner as a suspect was not prejudicial. At the time of Detective Charvis's prior sworn testimony, he did not have the time estimate from Dr. Wushensky. The State did not choose to indict Petitioner until after this time estimate was made. Had Detective Charvis been confronted at trial with his prior sworn testimony, he would have been permitted to explain his prior inconsistent statement. Tenn. R. Evid. 803(26), 613(b). We conclude that Detective Charvis's prior determination that Petitioner was not a

suspect would not have affected his credibility or altered the outcome of the proceeding. *Goad*, 938 S.W.2d at 370.

## 2. Co-Defendant's Military Records: Suicidal/Homicidal Ideations

Petitioner argues that trial counsel failed to offer proof of his claim during his opening statement that "[Co-Defendant] killed the baby." She contends that trial counsel's failure to investigate and present evidence of Co-Defendant's suicidal and homicidal ideations prejudiced her.

The State responds that Petitioner has failed to show that Co-Defendant's military records of his medical treatment "would have provided the proper 'ammunition' to convict him and spare her a guilty verdict." It contends that "[a]ny evidence portraying [C]o-[D]efendant as the physical abuser would not undermine the jury's conclusion that [P]etitioner was criminally responsible for his abuse."

As previously concluded, trial counsel was deficient for failing to seek Co-Defendant's military records. Thus, the question before us is whether the absence of the evidence of Co-Defendant's mental health issues as revealed in those records prejudiced Petitioner in light of the evidence presented against her at trial.

In Co-Defendant's military records, the following information is found regarding Co-Defendant's mental health:

| Date | Relevant Medical Chart Notes |
|---|---|
| July 18, 2008 | • Anxiety<br>• anger<br>• depression<br>• easily angered for past six months, worsening over past 2-3 months |
| August 21, 2008 | • anxiety disorder<br>• history of suicidal and homicidal ideation (SI/HI)<br>• last (SI/HI) incident . . . was 19 Aug 08 after having been "yelled at" by a superior<br>• fear of losing self-control<br>• inability to communicate effectively<br>• depression as a chronic condition<br>• hypersensitivity being quick to take offense<br>• overreacting to real or imagined slights or failures |
| September 27, 2008 | • anxiety disorder |

| October 17, 2008 | • depression |
|---|---|
| | • disturbed conduct |
| | • quite upset and tearful . . . after a confrontation with his [non-commissioned officers] |
| | • If [Co-Defendant] remains in the Army he will continue to struggle to adapt and may present a significant risk to himself and others[.] |
| | • poor integration |
| | • marginal duty performance |
| October 20, 2008 | • depression |
| | • adjustment disorder |
| October 25, 2008 | • depression |
| | • adjustment disorder |
| October 27, 2008 | • depression |
| | • adjustment disorder |

While the evidence of Co-Defendant's anger and suicidal and homicidal ideations would have assisted Petitioner in her defense theory that Co-Defendant was the one who inflicted the fatal injuries, we conclude that this evidence alone would not have affected the State's theory that she was culpable under the theory of criminal responsibility. Therefore, we cannot say that the absence of Co-Defendant's military records showing the state of his mental health and his violent tendencies would have a reasonable probability of affecting the outcome at trial. Petitioner is not entitled to relief on this issue.

### 3. Petitioner's Mental Health Records

#### a. Deficient Performance

Petitioner argues that trial counsel was deficient in failing to procure her mental health records because trial counsel observed her "flat affect" and admitted that, when he sees a client with a "flat affect," it is important to know if there is an underlying mental health issue. She contends that trial counsel had a duty to anticipate the State's and Co-Defendant's theories of culpability.

The State responds that trial counsel acted reasonably in choosing not to investigate. Moreover, the State argues that Petitioner's mental health records would not have rebutted the medical evidence that the victim died of blunt force trauma. It argues that the mental health records could not have overcome Dr. Wushensky's testimony

regarding the timing of the fatal injuries and that Petitioner was still in the home at that time.

Two years before trial, in a letter dated June 7, 2012, Lauranne D. Thatcher, Mental Health Examiner with the State of Oregon, told trial counsel that, after the victim's death, Petitioner

> began to demonstrate all the behaviors that are associated with Posttraumatic Stress Disorder (PTSD) including recurrent and intrusive distressing recollections of the murder and persistent numbness of general responsiveness when discussing the event. This came across as a flat affect. She avoided stimuli associated with the trauma and had some inability to recall important aspects of the murder. She had markedly diminished interest in significant activities, seemed detached from others and had a sense of a foreshortened future (hopelessness.) I observed that she had four out of the five persistent symptoms of chronic PTSD; difficulty falling or staying asleep, irritability or outbursts of anger, difficulty concentrating, and hypervigilance. The duration of these symptoms continued well over a year and [Petitioner] has worked with therapists and doctors to learn to live with this disorder and to try to adjust to normal life again.

Trial counsel recalled that, when he met with Petitioner, she had a "flat affect" and said that she "seem[ed] to lack emotion," yet in the same line of questioning, he testified that he did not recall "there being any information about people having a flat affect." He thought that Co-Defendant's counsel "just brought that up somewhat out of the blue" and "was not expecting that[.]" Trial counsel did not recall whether Petitioner told him about her mental health diagnoses and stated that he did not "think that she was either incompetent or was insane at the time." Petitioner testified that she told trial counsel that she had "some mental health diagnoses" since the victim's death but did not assert that she was "crazy" or "not in [her] right mind." Mr. Simmons testified that criminal defense attorneys should "pay attention" to mental health issues in a case because these issues "directly affect behavior and they're present in almost all cases, especially in homicide cases."

Trial counsel had "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Trial counsel's stated reason for choosing not to investigate Petitioner's mental health was that he "never saw anything when [he] talked with [Petitioner] that indicated to [him] that she had mental problems or emotional problems that warranted an evaluation or an investigation." However, in the course of the few meetings he had with

her over a two-year period,[4] he noticed that she had a flat affect and was unemotional when discussing the case, and he also had a letter from a mental health professional indicating Petitioner had significant mental health issues and had been through treatment with "therapists and doctors."

Citing *Henley v. State*, the State argues that trial counsel was reasonable in not investigating Petitioner's mental health records because Petitioner did not tell him about her mental health issues. In *Henley*, the petitioner was convicted of capital murder. 960 S.W.2d at 573. The petitioner presented testimony from an expert witness on post-conviction that the petitioner "lost the family farm because he had a learning disability and was a bad manager and that [the petitioner] was depressed about the loss of the family farm and was 'self-medicating' with alcohol and drugs near the time of the homicides." *Id*. at 582-583. The petitioner argued that his trial counsel was deficient for failure to investigate his mental health and present this evidence at his sentencing hearing as mitigating evidence. *Id*. at 583. This court reversed his convictions, and the supreme court reinstated them, stating:

> At the trial of this case, the [petitioner] maintained his innocence, flatly denied that he had been intoxicated on the day of the murders, and also denied ever abusing drugs. Moreover, [the petitioner] said his farming operation had failed because of unpredictable weather, a drought followed the next year by floods. Clearly then, the evidence for which trial counsel is now faulted for not discovering and introducing would have been inconsistent with the [petitioner's] own testimony and harmful to the defense theory throughout the trial.

*Id.*

This case is markedly different from *Henley*. First, the mental health evidence provided by Petitioner at the post-conviction hearing testimony in no way conflicts with any of the information provided by Petitioner to trial counsel. Trial counsel in *Henley* had no information at all regarding any mental health issues of the petitioner; in fact, the petitioner flatly denied any issues. However, in this case, trial counsel had his own observations of a "flat affect" as well as a letter from a mental health professional regarding Petitioner's PTSD following the death of her child and that Petitioner had sought treatment with "therapists and doctors." We distinguish *Henley* on these grounds.

---

[4] The post-conviction court found that trial counsel remembered meeting with Petitioner "two or three times;" however, this misconstrued the evidence. Trial counsel only recalled that it "wasn't many" times that he met with Petitioner. Petitioner testified that it was "[j]ust a couple [meetings]. Two or three maybe." In contrast, Ms. Lindsey met with Co-Defendant every month, and Ms. Phillips met with Co-Defendant "over a dozen times."

Petitioner testified that she told trial counsel of her mental health diagnoses; trial counsel testified that he did not recall what Petitioner told him regarding her mental health issues. The post-conviction court found that "[t]here was no evidence that [P]etitioner informed counsel of an emotional or psychological condition." It is true that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions[,]" and "what investigation decisions are reasonable depends critically on such information." *Nesbit*, 452 S.W.3d at 796 (citing *Strickland,* 466 U.S. at 691); *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002) (quoting *Strickland,* 466 U.S. at 691) ("Although a defendant's statements or confessions do not eliminate counsel's duty to investigate, the reasonableness of counsel's actions 'may be determined or substantially influenced by the defendant's own statements or actions.'") Notably, *Strickland* stands for the proposition that trial counsel may make a reasonable decision not to investigate based on information provided by or the actions of a defendant; it does not stand for the proposition that trial counsel has no duty to investigate unless a defendant affirmatively volunteers information. *See Andrews v. Davis*, 944 F.3d 1092, 1111 (9th Cir. 2019) ("[N]either *Strickland* nor its progeny suggest that a client's failure to affirmatively volunteer information about his past relieves counsel of the independent duty to investigate it—*especially* when the record suggests counsel never bothered to ask."); *Commw. v. Malloy*, 856 A.2d 767, 788 (Pa. 2004) ("The onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit" because "[c]ounsel's duty is to discover such evidence through his own efforts, including pointed questioning of his client."); *see also John Henry Sparrow, III v. State*, No. M2004-00492-CCA-R3-PC, 2004 WL 2853375, at *8 (Tenn. Crim. App. Dec. 10, 2004) (finding deficient performance regardless of whether the defendant volunteered facts to trial counsel regarding two defense witnesses), *perm. app. denied* (Tenn. June 20, 2005); *but see United States v. Miller*, 907 F.2d 994, 999 (10th Cir. 1990) (concluding that trial counsel cannot be ineffective for failing to investigate when a defendant affirmatively withholds "the essential and foundational information required to trigger such an investigation" from trial counsel).

Even granting deference to the post-conviction court's finding that there was "no evidence" that Petitioner informed trial counsel of her mental health issues, trial counsel's duty to investigate remained in light of the information he did have --Ms. Thatcher's letter to trial counsel as a mental health professional and trial counsel's own observations that Petitioner had a "flat affect" and was "unemotional." Moreover, trial counsel did not seek out anyone who knew Petitioner, and he chose not to discuss any issues with the witnesses that came forward of their own accord. Trial counsel did not speak with any medical professionals at all, except for "whoever authored the autopsy report." "[I]n most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible." *Burns*, 6 S.W.3d at 462 (citing *Baxter*, 523 S.W.2d at 933).

Trial counsel cannot fail to interview most of the witnesses, ignore Petitioner's friends and family, confer sparsely with Petitioner over the course of two years, disregard a letter from a mental health professional and his own observations about Petitioner, and then claim that his decision not to investigate was reasonable because he did not know about Petitioner's mental health issues. Further, if trial counsel had spoken to the State's witnesses, he would have been able to anticipate the use of Petitioner's unemotional demeanor as evidence of her guilt, rather than claim that the strategy came "out of the blue." We see no evidence that trial counsel made a reasonable decision that would have rendered such investigations unnecessary, and we find that his failure to investigate Petitioner's mental health "resulted from inattention, not reasoned strategic judgment." *See Wiggins*, 539 U.S. at 526. Moreover, we conclude that there were sufficient red flags regarding Petitioner's mental health that trial counsel was deficient in failing to investigate. *See e.g., Maurice Johnson v. State*, No. E2017-00037-CCA-R3-PC, 2018 WL 784761, at *19 (Tenn. Crim. App. Feb. 8, 2018), *perm. app. denied* (Tenn. June 6, 2018) (finding that, where trial counsel had discovery pointing to potential alibi witnesses, he was deficient in failing to investigate); *Blain Steven Covert v. State*, No. E2013-02531-CCA-R3-PC, 2014 WL 4345724, at *8 (Tenn. Crim. App. Sept. 2, 2014) (finding deficient performance where trial counsel ignored information from the defendant's parents, his grandmother, and another relative that the defendant received mental health counseling and prescription medication as well as the defendant's own statements that he was recently diagnosed with multiple emotional disorders).

Finally, the State contends that trial counsel did not find Petitioner's behavior to warrant investigation into her mental health for the defenses of "incompetency, insanity, or diminished capacity." However, Petitioner has never argued that she was incompetent, insane, or had diminished capacity; rather, she argues that evidence of her mental health diagnoses would have rebutted evidence presented against her at trial regarding her lack of emotion and unusual comments. We conclude that Petitioner has satisfied the deficiency prong of *Strickland*.

<u>b. Prejudice</u>

Had trial counsel properly investigated Petitioner's mental health problems, he would have discovered that, following the victim's death, Petitioner was involuntarily committed to MTMHI for a suicide attempt and was diagnosed with PTSD, depression, anxiety disorder, panic attacks, dependent personality disorder, and dissociative disorder. Ms. Zern testified as an expert witness at the post-conviction deposition that Petitioner appeared to have a "flat affect" because traumatic events caused "hypo-arousal, where she would sort of numb out, or she would . . . dissociate. And so when she was numb, she often looked flat." Ms. Zern stated that she observed Petitioner's dissociative state several times over the course of Petitioner's twenty-eight months of treatment. She stated

that trauma survivors "who are in an acute phase, there's a bit of unreality and shock, and you can . . . *hardly tell that anything has happened*." (emphasis added). This evidence would have rebutted the State's witnesses who testified that Petitioner's demeanor was "flat" or "unemotional" at the hospital and that she behaved abnormally by texting and asking inappropriate questions. Moreover, Ms. Zern's testimony would have directly contradicted the arguments of both the prosecutor and Co-Defendant's counsel that Petitioner's affect and comments were evidence of her guilt. *See Joshua Starner*, 2016 WL 1620778, at *24.[5]

The State argues that Petitioner's mental health records did not rebut the medical proof at trial. However, as stated previously, Petitioner's argument has never been that the medical proof was wrong but rather that she was not present when the fatal injuries were inflicted and that she did not know what happened. Further, the evidence against Petitioner, while sufficient for conviction, was not overwhelming. *See United States v. Montgomery*, 442 F. Supp. 3d 875, 891 (W.D. Pa. 2020), *as amended* (Mar. 4, 2020) (stating that sufficient evidence for conviction "does not preclude a finding of prejudice"), *appeal dismissed*, No. 20-1865, 2020 WL 6277527 (3d Cir. Aug. 11, 2020). The State argued in its closing that "old bruising" showed that Petitioner and Co-Defendant spent the "weekend" beating the victim. Of the nine medical professionals who testified, only one -- Dr. Abramo -- testified that he saw "old bruising" of "varying degrees" on the victim that looked "greater than a day." However, Dr. Abramo did not testify as to the extent or severity of the bruising -- whether it was bruising consistent with an uncoordinated toddler or something more sinister -- and the State provided no evidence that the "old bruising" was related to the infliction of fatal injuries as charged here. In fact, Dr. Lewis stated that the severe injuries which she saw during the autopsy were "inflicted at or around the same time" rather than over the course of days as suggested by the State.

Further, Dr. Wushensky testified at trial that the time between the infliction of victim's injuries and the time of his brain scan at 3:58 p.m. was possibly "six to eight hours." Dr. Wushensky repeatedly warned that his estimate was not an exact timeframe

---

[5] In finding the evidence sufficient to convict Petitioner on direct appeal, this court stated:

Multiple witnesses to [Petitioner's] behavior after [Petitioner] called 911 reported that she expressed no emotion. She did not go near the victim in the small emergency room. During questioning by the police, [Petitioner] did not inquire about the health status of the victim. During questioning by child services, [Petitioner] did not appear upset, spent time texting on her phone, and expressed frustration that the victim might have to go to foster care if he survived. She also inquired about selling her possessions.

*Joshua Starner*, 2016 WL 1620778, at *24.

and was based on studies performed on adults rather than children. He stated that he could not "extrapolate back from a single picture" to get an exact timeframe. However, even if Dr. Wushensky's estimation was exact, six to eight hours prior to 4:00 p.m. is 8:00 a.m. to 10:00 a.m.[6] Petitioner told the police that she left the apartment at about "10:00 or 10:30" that morning, which was corroborated by the commissary receipt and the cell phone records. Based on Dr. Wushensky's estimate of the timing of the victim's injuries, Petitioner could have been in the car on the way to the commissary when the fatal injuries were inflicted, or she could have been present in the home.

Because the evidence against Petitioner was not overwhelming, and because Petitioner's mental health evidence would have answered serious questions regarding her demeanor, we conclude that there was a reasonable probability that the outcome of the proceedings would have been different had trial counsel investigated Petitioner's mental health. *Goad*, 938 S.W.2d at 370. The absence at trial of the evidence of Petitioner's mental health diagnoses undermines our confidence in the verdict. *Id*.

The State argues that trial counsel provided evidence in the form of a medical record from Vanderbilt Children's Hospital, in which social worker Edith Crumb noted that Petitioner was "grieving appropriately" and that she asked to speak to a chaplain. Therefore, the State contends, the absence of Ms. Zern's testimony and Petitioner's mental health records did not prejudice Petitioner. However, trial counsel admitted that he did not even speak to Ms. Crumb or eight of the nine medical personnel who testified. Further, the note in Ms. Crumb's medical record that Petitioner was "grieving appropriately" did not explain the observations of other witnesses of Petitioner's "flat affect" or her unusual comments. A great deal of the case against Petitioner was based on her "flat affect" and her comments at the hospital. Therefore, we conclude that trial counsel's presentation of two lines in a medical record at trial does not preclude a finding of prejudice, where the admitted medical record did not specifically explain the unusual observations of other trial witnesses, and where trial counsel did not even interview or call as a witness the author of that medical record. *See e.g., Sears v. Upton*, 561 U.S.

---

[6] We note that the prosecutor at the post-conviction hearing and the State on post-conviction appeal averred that the latest time the injuries could have been inflicted was "9:00 a.m." based on Dr. Wushensky's testimony. *See Joshua Starner*, 2016 WL 1620778, at *5. Moreover, this Court on direct appeal stated that Dr. Wushensky's testimony was that the timing of the injuries "would have been before 9:00 a.m.[,]" which "placed [Petitioner] at the apartment when the injuries occurred." *Id*. at *5, *24. However, 9:00 a.m. is *seven* hours prior to 4:00 p.m., not the six hours which Dr. Wushensky estimated could be the latest time. "This case lends further support to the old saying that lawyers can't do math." *Layer-Rosario v. Allied Mortg. Capital*, No. 3:16-CV-00628, 2017 WL 1347770, at *1 (M.D. Tenn. Mar. 17, 2017) (citing Debra Cassens Weiss, *Posner: Lawyers Bad at Math are an Increasing Concern; Inmate's Blood-Pressure Suit Shows Why*, ABA JOURNAL (Oct. 29, 2013) ("Innumerable are the lawyers who explain that they picked law over a technical field because they have a 'math block.'")).

945, 954 (2010) (stating that presenting "*some* evidence" does not "foreclose an inquiry" into whether a deficient investigation was prejudicial) (emphasis in original); *Williams v. Taylor*, 529 U.S. 362, 369, 399 (2000) (finding that, despite trial counsel's presentation of some mitigating evidence during the penalty phase, there was "a reasonable probability that the result of the sentencing proceeding would have been different" had trial counsel "presented and explained the significance of *all* the available evidence") (emphasis added).

Finally, the State argues that the MTMHI records "also indicated that [P]etitioner may have faked the suicide attempt," which would be a "valid reason not to delve into [P]etitioner's mental history" at trial. Upon release from MTMHI, the doctor noted:

> [Petitioner] was thinking about her son's death and felt sad. She cut her left wrist and ankle and called her friend. She did not tell . . . anyone that she wanted to bleed to death. She didn't cut deep, she did not need stitches. She says that she cut her wrist to take away her pain and relieve her emotions but not to kill herself. It was not a suicide attempt. She had no intentions of killing herself. She denies any suicidal/homicidal ideation or hallucinations or prior suicide attempts.
>
> . . . .
>
> She was seen by the medical team, wound care was ordered for the wounds on her left wrist and left ankle. The following day, she slept well, rested well, denied any suicidal/homicidal ideation and tolerated her medications okay without side effects. Toward the end of her stay, she was feeling better, had a brighter affect. No further self[-]injurious behaviors. She tolerated the Celexa without any side effects. She continued to do well and improve.

We consider the State's characterization of this medical note as evidence of a "fake suicide attempt" to be specious. Moreover, Ms. Zern's testimony would have rebutted this characterization, explaining that, when Petitioner was released from MTMHI, she likely tried to "minimize either [her] current suicidality or what [she was] admitted for. It's also possible that she had -- that she was feeling better, you know, she was less suicidal when she left [MTMHI]." Thus, the post-conviction court erred in concluding that "there has been no showing that the absence of [Ms. Zern's] testimony establishes a prejudice to the defense of Petitioner." Based on this ground, we reverse the judgment of the post-conviction court and remand for a new trial.

<u>C. Failure to Present Witnesses</u>

Petitioner argues that trial counsel was deficient for failing to call four known character witnesses who had asked before trial to testify on Petitioner's behalf. Citing *Strader v. State*, 344 S.W.2d 546, 547 (Tenn. 1961), Petitioner contends that the character witnesses would have offered "relevant character evidence on [Petitioner's] innocence" that would "make it improbable" that she "would be guilty of the crime charged."

The State responds that trial counsel's decision not to call the character witnesses is entitled to deference. It contends that Petitioner was not prejudiced by trial counsel's decision because the character witnesses would not have "undermined the outcome of the trial given the undisputed medical evidence[.]"

When a petitioner claims that trial counsel was ineffective for failing to discover, interview, or present a witness in support of the petitioner's defense, such witness should be presented at the post-conviction hearing. *Black*, 794 S.W.2d at 757. As this court has previously stated:

As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel.

*Id.* Without presenting the witness's testimony at the post-conviction hearing, the petitioner generally cannot establish prejudice under *Strickland*. *Id.* at 758.

*1. Deficient Performance*

Here, Petitioner called five witnesses to testify at the post-conviction hearing, four of whom had contacted trial counsel prior to trial and asked to be called as a witness. All five of the witnesses testified that, until Petitioner moved to Tennessee four weeks before the victim's death, Petitioner was still the loving, nurturing mother they had always known. They testified that Petitioner made her own baby food and was scrupulous about doctor's appointments and the victim's health. None of the witnesses had ever seen

Petitioner exhibit anger or impatience with the victim or with anyone else. The four witnesses who asked trial counsel if they could testify were all told that they would not be needed at trial.

One witness was a medical professional, one was a mental health professional, one was Petitioner's godmother, and two were long-time friends. Ms. Converse, a home health nurse, testified that she was shocked when she learned Petitioner was charged with the victim's murder "[b]ecause that [wa]s not the person [she] knew." Ms. Converse stated that she "just wanted to voice how -- what a protective and concerned mama she was" and that Petitioner was always concerned about doing the right thing as a parent. Ms. Thatcher, a mental health professional, testified, "I never heard a voice raised. . . . [S]he was very soft-spoken, kind, encouraging. . . . And I just noticed that there was no yelling." Ms. Thatcher said that, after sending trial counsel a letter detailing Petitioner's mental health issues following the victim's death, she called trial counsel. However, she said that trial counsel "didn't want to hear anything from [her]." Ms. Maranov, Petitioner's godmother, testified that she never saw Petitioner get rough, aggressive, or violent or lose her temper with the victim. Ms. Maranov observed good eye contact between Petitioner and the victim, "lots of hugs and kisses," "[a] lot of affection[,]" and "[r]eally good nutrition." Ms. Rich testified, "[N]o one is going to convince me that in seven weeks" from the time of Petitioner's wedding until the victim died, "[P]etitioner could change that much" so as to murder her child. Ms. Holley testified that she never observed Petitioner discipline the victim in an inappropriate way or be rough with him. Ms. Holley stated that Petitioner was always reading to the victim and that Petitioner was very selective about choosing a daycare. She testified that she was "sick" when she heard Petitioner was arrested because it "wasn't the [Petitioner] that [she] knew[.]"

Petitioner presented these five witnesses to the post-conviction court and has shown that trial counsel was aware of four of the witnesses prior to trial. The post-conviction court made no findings of fact regarding the credibility of these witnesses. The post-conviction court concluded that Petitioner had not shown prejudice, stating, "Testimony of Petitioner's conduct in providing care for her child while living in Oregon, prior to her moving to Tennessee and prior to her marriage to [C]o-[D]efendant, . . . seems unlikely to be relevant to the issue of her appearing to display sufficient emotion."

We agree with Petitioner that these witnesses offered relevant character evidence which could have been admitted as opinion and reputation testimony. *See* Tenn. R. Evid. 404(a)(1) ("In a criminal case, evidence of a pertinent trait of character offered by an accused" is admissible); *State v. Davidson M. Taylor*, No. W2006-00543-CCA-R3-CD, 2007 WL 3026374, at *4 (Tenn. Crim. App. Oct. 12, 2007) ("[A] defendant's proof under Rule 404 (a)(1) is limited to reputation and opinion evidence only."). Trial counsel stated that he did not use the character witnesses because did not think they were relevant and

because presenting character witnesses for Petitioner would have "offended" the jury. He said that "it was . . . not a great defense to talk about what a great mom she was based upon the condition of [the victim]." We find this explanation wholly unreasonable. We see no legitimate strategic reason that he ignored this important evidence which was handed to him. *See Murrell v. Giroux*, No. 1:13-CV-2573, 2018 WL 509371, at *17 (M.D. Pa. Jan. 23, 2018) ("[T]his court is unable to conceive of any reason to refrain from calling known character witnesses on behalf of a defendant who has no criminal history, claims he has a reputation in the community for good moral character, and is accused of a vicious murder."). We conclude that trial counsel was deficient in failing to interview and present these character witnesses.

## 2. Prejudice

Turning to the prejudice prong, we conclude that, had trial counsel presented all four of the witnesses who had contacted him prior to trial, Ms. Rich, Ms. Converse, Ms. Holley, and Ms. Thatcher, there is a reasonable probability that the outcome of the proceeding would have been different. As stated previously, the evidence against Petitioner, while sufficient for conviction, was not overwhelming. Significant evidence of her long history of good character as a loving, nurturing, attentive mother had a reasonable probability of changing the outcome because "[g]ood character is a flower of the slow growth of years and does not change overnight." *Strader*, 344 S.W.2d at 547-548; *see also State v. Hobbs*, 705 S.E.2d 147, 148 (Ga. 2010) ("Good character . . . can by itself create a reasonable doubt as to a defendant's guilt and lead to an acquittal."). We conclude that the testimony of these character witnesses may have "made it improbable" that Petitioner "would be guilty of the crime charged" to the point that our confidence in the outcome of the verdict is undermined. *Strader*, 344 S.W.2d at 548; *Goad*, 938 S.W.2d at 370; *see also Murrell*, 2018 WL 509371, at *18 (finding that, in a "close case" where the evidence not overwhelming, "it is quite possible that the presentation of character witnesses attesting to [the petitioner's] good character could have tilted the balance of the scales in his favor"). Thus, trial counsel's deficient performance in failing to present these known character witnesses prejudiced Petitioner, and we reverse and remand for a new trial based on this ground.

## II. Cumulative Error

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77.

For cases that warrant assessment under the cumulative error doctrine, our supreme court explained:

> Of necessity, claims under the cumulative error doctrine are *sui generis*. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*Id.* (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)) (alterations in original).

Reversals for cumulative error are rare. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). However, prior cases exemplify when reversal is appropriate. *See State v. Bigbee*, 885 S.W.2d 797, 809-12 (Tenn. 1994), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004). For example, in *Bigbee*, the Tennessee Supreme Court reasoned, "Though each of the errors discussed above might have been harmless standing alone, we find that, considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affect the jury's sentencing determination to the defendant's prejudice." *Id.* at 812.

Here, trial counsel failed to approach the most basic standards of professional conduct. He did not speak to anyone involved in the investigation except "whoever authored the autopsy report" and "two or three" police officers. He did not interview eight of the nine medical personnel who testified at trial. He did not interview or call as a witness the one medical staffer who noted that Petitioner was "grieving appropriately." He did not interview Petitioner's family or friends in Oregon. He did not investigate the mental health of either Petitioner or Co-Defendant. He did not investigate Co-Defendant's military records. He ignored letters from Petitioner's friends and family, including one from a mental health professional. He filed two pretrial motions and conceded in court that there was no legal basis for them. He refused to call the four character witnesses who asked to testify on Petitioner's behalf. In fact, he did not call *any* witnesses at trial. He did not cross-examine eleven of the fifteen witnesses at trial. He never met with Co-Defendant's counsel, Ms. Phillips. Given the gravity of the criminal charges against Petitioner, trial counsel could not have reasonably elected to rely exclusively on a grocery store receipt for his defense and to forego all other investigation. *See Gregg v. Rockview*, 596 F. App'x 72, 77 (3d Cir. 2015); *see also People v. Irvine*,

882 N.E.2d 1124, 1137 (2008). ("[A]n attorney cannot be found to have made decisions based on valid trial strategy where he or she fails to conduct a reasonable investigation, fails to interview witnesses, and fails to subpoena witnesses."). We conclude that trial counsel's almost complete inattention to Petitioner's case was deficient performance. *Jeffrey Whitaker v. State*, No. E2001-02399-CCA-R3-PC, 2003 WL 21276125, at *3 (Tenn. Crim. App. June 3, 2003) (citing *State v. Mitchell,* 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988)) ("In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather we should examine them in the context of the case as a whole.").

Moreover, had the jury been apprised of Petitioner's mental health issues, including her dissociative disorder; Co-Defendant's mental health issues, including his suicidal and homicidal ideations; and the numerous character witnesses who testified to how attentive and loving a mother Petitioner was, we believe there is a reasonable probability the outcome of the proceeding would have been different. Thus, we conclude that the accumulation of a myriad of errors prejudiced Petitioner, requiring reversal based on cumulative error.

## Conclusion

Based on the foregoing, we reverse, vacate the judgments of conviction, and remand for a new trial.

_____
ROBERT L. HOLLOWAY, JR., JUDGE